# NORTHWESTERN BELL TELEPHONE COMPANY
## v. STATE AND ANOTHER.

216 N. W. 2d 841.

March 22, 1974—Nos. 44155, 44192.

2

*Warren Spannaus*, Attorney General, *John M. Mason*, Chief Deputy Attorney General, and *Michael P. Sullivan* and *Michael R. Cunningham*, Special Counsel, for appellant state.

*Joseph A. Maun, Lawrence J. Hayes, Maun, Hazel, Green, Hayes, Simon & Aretz, Melvin R. Quinlan*, and *Garfield E. Lovaas*, for respondent.

OTIS, JUSTICE.

These proceedings have been brought by Northwestern Bell Telephone Company (the company) to obtain from the Minnesota Public Service Commission (the commission) authority to adopt a telephone rate increase in Minnesota. The State of Minnesota, the city of Minneapolis, and the Department of Defense, acting on its own behalf and for all other executive agencies of the United States, were granted leave to intervene. The commission approved a rate increase which would produce additional gross revenues of $34,025,720 and net earnings of $14,443,918. The

state and the city of Minneapolis appealed to the district court. That court disallowed as a part of the company's rate base the sum of $4,969,017, representing materials and supplies on hand, and remanded the matter to the commission to redetermine the company's revenue requirements and to arrive at an appropriate refund. The appeal was in all other respects dismissed. It is from that order the state and the city appeal to this court. By notice of review, the company appeals from that part of the order which excluded the $4,969,017 from its rate base and which remanded the proceedings for purposes of determining a refund. We affirm.

In seeking reversal, the state alleges in general terms that the commission failed to require the company to sustain its burden of proof; failed to perform its inquisitional functions; failed to delineate the reasons underlying its findings, conclusions, and order; and gave inordinate weight to irrelevant and immaterial considerations. The specific issues which emerge are these:

(1)   In arriving at a rate base of $621,680,763, did the commission adopt a proper formula which accurately reflected (a) trending; (b) obsolescence; (c) the relation of debt to equity; (d) excess capacity; (e) material and supplies on hand excluded by the trial court; and (f) "prudent acquisition cost" of equipment purchased from Western Electric Company, a subsidiary of American Telephone and Telegraph Company?

(2)   Was the rate of return of 7.5 percent, which the commission approved, justified by the evidence?

(3)   Did the trial court have authority to remand the matter to the commission for purposes of computing and distributing a refund?

Minn. St. c. 216A created the Department of Public Service to assume the functions of the Railroad and Warehouse Commission as of May 26, 1967. Minn. St. 216A.05, subd. 1, defines the commission's duties as follows:

"The functions of the commission shall be legislative in nature. It may make such investigations and determinations, hold such hearings, prescribe such rules and regulations and issue such

orders with respect to the control and conduct of the businesses coming within its jurisdiction as the legislature itself might make but only as it shall from time to time authorize."

Pursuant to § 237.02, the commission was vested with jurisdiction and supervision over telephone companies doing business in this state. The procedures for establishing rates are governed by § 237.08, which reads as follows:

"When such rates or schedules are found to be unreasonable by the department, upon its own motion or upon complaint, it shall prescribe reasonable rates to take the place of those found unreasonable and such new rates shall be filed in place of the rates or schedule superseded. In determining the valuation of any telephone property for the purpose of prescribing reasonable rates, the department shall give due consideration to evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the telephone company less depreciation on each, current values thereof and any other factors or evidence material and relevant thereto.

"No rates filed with the department shall be changed by any telephone company without an order of the department sanctioning the same. It shall be unlawful for any telephone company to collect or receive a greater or less rate or charge for any intrastate service rendered by it than the rate or charge named in the schedules on file with the department, and no new rate shall take effect until the date named by the department, which shall not be less than ten days after it is filed."

The process by which rates are fixed is, first, to determine the value of the company's property represented by the equity of its stockholders; second, to establish a fair rate of return which will provide earnings to investors comparable to those realized in other businesses which are attended by similar risks, will allow the company to attract new capital as required, and will maintain the company's financial integrity; and, third, to compute corporate taxes, depreciation reserves, and other expenses of op-

erating the company. The rates charged subscribers are thereupon authorized in an amount which will equal the sum of the return to investors and the company's operating expenses.

It is undisputed that at the time of the company's application to the commission its book value was $573,674,137. It had not had a rate increase since 1958. To establish its needs, the company used as a test year the period from May 31, 1970, to May 31, 1971. From 1958 to 1970, its investment per main telephone increased from $377 to $666. During that period, although the number of its employees in Minnesota increased only 22.7 percent, its wage payments increased 93.6 percent. At the time of its application, the company operated nearly 1.8 million telephones, serving approximately 955,000 customers through 652 exchanges in Minnesota. The commission found that since 1968 the company's operating expenses had increased at a faster rate than revenues, that the company earnings for the test year were at a 13-year low, and that the rate of return on its investment had been steadily declining. All of the parties concede that the company is entitled to a rate increase in some amount. The state suggested a rate which would realize gross additional revenues of approximately $16,700,000 and a net of $7,100,000. The issue is whether the formula adopted by the commission resulted in a charge to subscribers substantially in excess of the company's needs.

■ *Rate base.* (a) *Trending.* A summary of the company's computation of its current value was introduced as an exhibit which set forth the following totals:

| | |
|---|---:|
| Book Cost of Plant and Equipment | $909,468,248 |
| Less: Interstate Portion | 206,908,938 |
| Intrastate Book Cost of Plant and Equipment | $702,559,310 |
| Material and Supplies—Intrastate | 4,969,017 |
| Working Cash—Intrastate | 3,482,343 |
| Total Intrastate Book Cost of Plant and Equipment, Material and Supplies and Working Cash | $711,010,670 |

Less: Depreciation Reserve—Intrastate     137,336,533

Intrastate Book Cost of Plant and Equipment,
     Material and Supplies and Working Cash
     Less Depreciation Reserve     $573,674,137

Intrastate Current Value of Plant and Equipment,
     Material and Supplies and Working Cash Less
     Depreciation Reserve     $731,349,628

In a supplemental report, the commission used the following method of arriving at the company's current value:

"Applicant's *intrastate* current value of plant and
     equipment, material and supplies and working
     cash, less depreciation reserve * * *     $731,349,628

Applicant's *intrastate* book cost of plant and
     equipment, material and supplies, working
     cash, less depreciation reserve * * *     $573,674,137

Difference between cost and current value     $157,675,491

Current value weighting (based on Applicant's
     equity ratio 58.9)     $ 92,870,764

Net book cost, telephone plant in service
     (intrastate only)     $532,421,010

Materials & Supplies     $ 4,969,017

Property held for future use     $ 1,073,617

Less Deferred Income Taxes     ($ 2,315,729)

Less Unamortized Investment Credit     ($ 7,337,916)

Current value factor     $ 92,870,764

Total intrastate Rate Base as of 5/31/71     $621,680,763"

It will be noted that the rate base was reached by "trending" the book cost of $573 million through the application of various inflationary indices to reach a current value of $731 million.[1] To determine how much of the $157 million difference was at-

---

[1] Northwestern Bell's general staff engineer, David Benton, defined "trending" as follows: "Trending essentially means that by use of price indexes, prices of prior years are trended, that is, brought forward to represent new price levels at the purchasing power of today's dollar."

tributable to investor's equity and how much to indebtedness, the company arrived at a ratio of 58.9 percent equity and 41.1 percent debt. The resulting trended value of equity, amounting to $92 million, was added to the book value, from which sum property not here in dispute was deducted to arrive at the trended value of $621,680,763.

(b) *Obsolescence.* The state vigorously contends that, although trending may be proper under some circumstances, it was not appropriate in these proceedings because the company failed to furnish adequate information concerning the degree of obsolescence in its plant and equipment. Without a detailed study of obsolescence, the state argues, the commission was not competent to determine whether there had been an increase or decrease in book value. In support of its position, the state points out that in an order dated January 25, 1972, the commission has directed the company to accelerate the replacement of aging step-by-step switching systems in the metropolitan area with electronic systems and to upgrade eight-party lines furnished some 56,000 rural subscribers by providing them with four-party service. These improvements alone will cost the company some $250 million, which suggests to the state that there is substantial obsolescence in the present system not reflected in the trended values. Accordingly, the state takes the position that "the most sensible, accurate and appropriate approach" would be to establish the fair value of the company's investment as net book value, namely $523,840,982.

Although the state introduced no evidence regarding rate base to rebut the company's presentation, it asserts that it was under no obligation to offer such evidence because the company had the burden of proof. Be that as it may, we are of the opinion that there was competent evidence from which the commission could arrive at the rate base it authorized. Minn. St. 237.08 directs the commission to "give due consideration to evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the telephone company less depreciation on

each, current values thereof and any other factors or evidence material and relevant thereto." In arriving at "current values," the company used its own index, obtaining results which closely paralleled those reached by using the Consumer Price Index developed by the Department of Labor and the Gross National Product Implicit Price Deflator Index developed by the Department of Commerce. The comparisons are set forth in the following excerpt from a company exhibit:

|  | "Historical | Current | | |
|---|---|---|---|---|
|  | "Telephone Plant Index | Consumer Price Index | Gross National Product Index |
| "1. Book Cost | 865,195 | 1,185,706 | 1,146,617 | 1,130,118 |
| 2. Depreciation Reserve | 179,382 | 297,449 | 284,235 | 284,080 |
| 3. Net Investment | 685,813 | 888,257 | 862,382 | 846,038" |

It is obvious that to ignore the effect of inflation would not only be contrary to the express provisions of the statute but would require a rate of return greatly in excess of 7.5 percent to satisfy the three criteria to which we have previously alluded.

On the issue of obsolescence, a witness for the company testified that it submitted to the Public Service Commission and the Federal Communications Commission reports which were reviewed every 3 years and included depreciation schedules which showed obsolescence. David Benton, the company's general staff engineer, testified that he was responsible for the company's depreciation studies in which obsolescence was "very definitely a factor," and that the company did not use a composite rate of depreciation but used individual rates for separate accounts. He stated that "[t]he depreciation rates which are prescribed by the F.C.C. and this Commission determine the depreciation accruals which are added to the reserve account each year."

To illustrate the manner in which depreciation and trending were considered, Mr. Benton was asked by the commission to

specify how "step-by-step" equipment which was approaching obsolescence was treated. In response, the witness said that this equipment was installed in the year 1940 at a cost of $806,789 which, in 1971, bore a translator of 2.193. The translator simply reflected the rate of inflation as to that particular item from the year of installation. Multiplying the translator by the original cost resulted in a figure of $1,769,288 as trended gross book value. The next step was to determine the depreciation accrual or depreciation reserve of the same equipment which, in 1971, amounted to $607,736. Trending that by the same translator resulted in a trended reserve of $1,332,765. The final step was to subtract the trended reserve from the trended book value to reach a trended net current value of $436,523.

The problem of dealing with equipment which is rapidly approaching obsolescence was discussed by Mr. Benton as follows:

"Q. (By Mr. Wandtke, continuing): Mr. Benton, I believe Northwestern Bell's 1971 construction program is about a hundred and twenty million dollars.

"A. No; it's considerably larger than that. I don't have the exact figure.

"Q. Maybe I'm thinking of Minnesota.

"A. This may be the Minnesota figure.

"Q. If this is the figure, can you estimate roughly what amount of the present plant would be retired when that construction is finished?

"A. No, I could not.

"Q. But there will be a substantial amount.

"A. There will be some. I don't know how substantial it will be. Much of that construction program money will go into so-called 'standing-still costs' in which no plant will be retired, and so-called 'modernization costs' in which no plant will be retired. So it's only in those cases where you have perhaps a central office replaced and this kind of thing where you get into major retirements.

"Q. Well, my point still would be, whatever plant is retired in 1971 as a result of this construction program here, this plant has a current value, and it will be retired in the next year.

"A. Yes, but presumably the depreciation rates are set in such a way that on the books the plant will be completely retired by the time it is taken off the books.

"Q. But this depreciation rate has nothing whatever to do with the current value we are talking about here, the current value increment that is to be in the rate base.

"A. I'm afraid I don't follow you.

"Q. What I'm saying is that some of this plant will be retired within the next year.

"A. Yes, it will be, but by the time it is retired it will be fully depreciated and will have been removed from both the book cost gross account and from the reserve account.

"Q. But I think this is another subject. I'm talking about the current value increment we are asked to put in a rate base for something which is on its way out.

"A. A current value increment which will be put into the rate base for this equipment which is to be retired very soon will be offset when the equipment is fully depreciated and that all of the original book cost and all of the depreciation reserve associated with that equipment will be removed from the books and in turn it will be replaced by new equipment and a new undepreciated investment will be added to the books.

"Q. But all of this will happen after we have taken these figures and established a current value rate base.

"I'm concerned that we are still putting a current value here on something that will be gone in the very near future. It has no current value. It's obsolete, ready for replacement.

"A. We are talking of current value as of May 31st, 1971.

"Q. Yes.

"A. You must pick a point in time.

"Q. Right.

\* \* \* \* \*

"COMMR. PETERSON: Now, when you have a plant which for good management reasons needs to be replaced and it has not been fully depreciated as of the time of that change, how do you treat that kind of a retirement? Is that all charged to the depreciation account so it comes out zero?

"THE WITNESS: Yes. The original cost of investment is removed from the books and the same amount is removed from the depreciation reserve account.

"Now, this is taken care of by constantly studying the various life characteristics and salvage characteristics for each of the accounts, and modifying the depreciation rates every three years to fit what is actually occurring in a given jurisdiction."

Mr. Benton's testimony was corroborated by the cross-examination of Harold Sievers, the company's statistician, who testified as follows:

"Q. (By Mr. Sullivan, continuing): What provisions are made for obsolescence in the valuation of property?

"A. This would be taken into account in the depreciation rates.

"Q. So there is no current valuation made of a particular plant to determine whether there is equipment in that plant which will be retired at a particular date in the future.

"A. Yes.

"Q. There is. So that you people are in a position presently to advise the Commission as to what plant or plants or equipment is scheduled for removal from service next year, the year after next and the year after that.

"A. I believe we could do this. I'd have to check.

"Q. Would you be in a position to prepare an exhibit which showed the current value of that equipment which is planned to be retired, and the year in which you plan to retire it?

"A. Well, this is part of our depreciation rates. In other words, this has been taken into account in our calculation of our

depreciation of rates and our depreciation reserve would reflect this amount.

"Q. Am I correct in assuming then that if an identifiable plant or piece of equipment were scheduled for removal from service next month, and this was known by you, that I could go to the schedule and find that there was a particular value put on that particular piece of equipment so that I would be in a position to judge whether that value placed on that particular piece of equipment adequately reflected the fact that it was going out of use in a month?

"A. Yes. You would—it would be part of your current value, and in your depreciation reserve it would also be part of that which—they'd both be inflated.

"Q. Then would it be possible to remove from your composite account those items which are scheduled for retirement and develop what the associated value of that item is?

"A. Well, these are all done, you know, on a trend basis and it's my understanding that this has all been taken into account in the calculation of these.

"Q. But you do not know for a fact that it has been taken into account.

"A. Yes, it has been."

The state complains that these were company witnesses and although more detailed information concerning obsolescence was promised, it was not forthcoming.

In affirming the commission on the issue of trended values, we recognize the fact that obsolescence is a basic consideration with which the commission must deal. We would be better satisfied had the commission addressed itself to that issue more precisely. In State ex rel. Utilities Comm. v. General Telephone Co. 281 N. C. 318, 189 S. E. 2d 705 (1972), the Supreme Court of North Carolina held in a telephone rate case that it was error for their utilities commission not to make a specific finding of replacement cost taking into account an appropriate allowance

for depreciation, including obsolescence. The court noted (281 N. C. 362, 189 S. E. 2d 733) :

"* * * In this era of automation and a well nigh constant flow of inventions and new techniques, the art of telephony is rapidly changing. Obsolescence often takes a heavier toll from the value of plant and equipment than does physical wear and tear."

It is of some significance that in its petition for reargument before the Public Service Commission, the state made no mention of the fact the commission failed to make specific findings on the question of obsolescence, nor did the state itself introduce testimony on this question. We are of the opinion and hold that the testimony concerning the factor of depreciation specified in the statute adequately dealt with the problem of obsolescence. However, as we have suggested, the process of review would be better served if obsolescence were treated with greater specificity in future litigation of this kind.

(c) *Relation of debt to equity.* We find no merit in the state's objection to the commission's finding that the company's capital structure was represented by 58.92 percent equity and 41.08 percent debt. The state asserts that the ratio of debt to equity has no relevance to the value of property included in the rate base and that the commission was arbitrary and capricious in disregarding evidence concerning the appropriateness of the company's "thick" capital structure. This argument is based on the fact that stockholders are entitled to a return only on equity and not on debt, and, therefore, the greater the debt incurred by the company the smaller the rate paid by subscribers to satisfy the needs of stockholders. We have difficulty accepting the concept that in a rate case of this kind the state may collaterally attack the judgment of the company in maintaining its embedded debt at a low figure. We agree with the position of the company that this is a discretionary matter of management which, in the

light of soaring interest rates, seems to vindicate the company's decision to keep its debt obligations to a minimum.

There was no attempt to refute the company's computation of the relation between equity and debt, and we hold that on this record it was proper for the commission and the district court to add 58.92 percent of trended value to the company's book value for purposes of establishing a rate base.

(d) *Excess capacity.* The commission found that the company properly included in the rate base property held for future use valued at $1,073,617; that such property was necessary for its Minnesota operations; that it inured to the benefit of its subscribers; and that the use of the property was imminent.

A witness for the company testified that property held for future use was included in the rate base when such use was imminent and definite. All equipment was engineered on the basis of some capacity for expansion. The company policy was to anticipate as accurately as possible the economic growth of the communities it served to prevent protracted periods of delay in obtaining service. Where property is purchased in anticipation of future price increases, the property is not part of the rate base unless its use is imminent. The state argues that the commission should not have allowed as part of the rate base any property representing excess capacity in the absence of testimony specifying how it was programmed and what standards were used for measuring it.

We dealt with this issue in State v. Tri-State T. & T. Co. 204 Minn. 516, 537, 284 N. W. 294, 307 (1939), where we said:

"We find adequate support in the record for the conclusion that some of the property has been made useless by the reconstruction of the plant and that other properties may at some time in the future be put in service in the plant but should not now be included in the rate base. When its use is imminent although not actual, its value may be taken into account; but unused property held for future use need not be included in the rate base unless its term of service is so near commencing that it has a

quality analogous to that of working capital. No formula is prescribed for the discovery of that quality, and it must be left to the trier of the facts within the limits of fair discretion and the light of the circumstances."

While we agree that testimony on this subject was not as lucid as we would wish, we believe that the commission's conclusions find support in the record. With the accelerating cost of labor and materials, for which no relief appears in sight, we cannot say that purchasing for future needs is not a "prudent acquisition." Indeed, it might be imprudent not to adopt such a policy in the light of what appears to be the inevitable economic and population growth of our urban areas. The character and extent of the expansion of a telephone system beyond immediate demands is again a judgmental decision which management must make. Unless there is evidence that such expansion has outstripped all likelihood of reasonably imminent use, and current subscribers are bearing a burden which should be shared by those who will ultimately benefit by it, the commission and the courts are not in a position to second-guess the engineering and economic expertise of company management. As we said in the Tri-State case, "By undertaking to serve the convenience of the public, the company has submitted a large part of its conduct to public scrutiny; nevertheless it retains title to its property and must be granted the reasonable managerial discretion that ownership implies." 204 Minn. 536, 284 N. W. 307.

(e) *Materials and supplies.* The commission found that the inventory of material and supplies which the company had on hand on May 31, 1971, was reasonably necessary to conduct its operations, and had a value of $4,969,017. It held that the company could properly include that amount in its rate base. The district court, however, reversed that portion of the commission's order and accordingly reduced the rate base to $616,711,746, which will generate additional revenues of $33,024,622. The court held:

"* * * In view of the financial structure of the Company and particularly the negative working capital status, they cannot be properly deemed as current assets, and the record fails to disclose any substantial support for the Commission's conclusion. Accordingly, the contention of appellants in this regard is sustained."

The company seeks to reverse the trial court on this issue, citing as authority the Tri-State case. However, the question is not the use to which the property was to be put but the source of funds with which it was purchased. It is undisputed that the working capital of the company during the test year was a negative $12,137,000. In other words, the company's current liabilities at that time exceeded its current assets by such amount. Consequently, the purchases of material and supplies were not attributable to the investment of the company stockholders. The amounts thus owed in excess of assets had to be paid from funds created by subscribers or by incurring further debt. The company argues that the elimination of this substantial item from the rate base simply translates into a larger rate of return if the company is to earn the additional revenues authorized by the commission. We cannot concur in this conclusion. The stockholders are not entitled to any return on the sum of $4,969,017 since it is not a part of the equity they have provided.

(f) *Western Electric equipment.* A more troublesome problem is the failure of the commission or the district court to adopt findings on the issue of whether purchases by Northwestern Bell from Western Electric were "prudent acquisitions." Citing Central Maine Power Co. v. Public Utilities Comm. 156 Maine 295, 163 A. 2d 762 (1960), the company argues that the words "prudent acquisition" are words of art which refer only to the acquisition by one utility of property belonging to another successor utility. We do not read that case so narrowly. It cites language used by Mr. Justice Brandeis, concurring, in State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 289, note 1, 43 S. Ct. 544, 547, 67 L. ed. 981, 986 (1923),

in which he describes "prudent investment" in a manner which the Supreme Judicial Court of Maine equates with "prudent acquisition cost." There, Mr. Justice Brandeis states:

"* * * The term is applied for the purpose of excluding what might be found to be dishonest or obviously wasteful or imprudent expenditures."

At the outset it should be noted that the state offered no proof that purchases from Western Electric were "dishonest, obviously wasteful, or imprudent." Nevertheless, as we construe the statute, it applies to expenditures of every kind made by a utility and does not have the restricted meaning which the company would have us adopt.

Western Electric and Northwestern Bell are both wholly owned subsidiaries of American Telephone and Telegraph Company. Ninety-eight percent of Western's sales are made to AT&T. It is undisputed that the amount charged by Western for equipment furnished Northwestern Bell was substantially lower than prices charged Northwestern Bell by other manufacturers for the same products. Western fixes its own prices, which are higher on sales to independent phone companies than to Bell. The subsidiaries of American Telephone and Telegraph are not required to buy from Western Electric but it is obviously to their advantage to do so.

Western realizes a net return of 9.4 percent on its investment in doing business with the Bell companies. There was testimony that the 50 largest manufacturers realized a return of 12 percent on their investments and that this was the same rate of return shown by Moody's 125 Industrials. In essence, it is the position of the state that a regulated utility such as Bell may not exploit an unregulated but wholly owned subsidiary of its parent company to avoid the restrictions on the rate of return imposed on the affiliated utility. Thus, the state argues, expenditures of Bell attributable to Western should not be allowed in computing the company's expenses to the extent they permit Western to realize

a rate of return greater than that authorized for Northwestern Bell. In City of Los Angeles v. Public Utilities Comm. 7 Cal. 3d 331, 102 Cal. Rptr. 313, 497 P. 2d 785 (1972), the Supreme Court of California has adopted the reasoning advanced by the state and the New York Supreme Court has leaned in that direction. In the Los Angeles case, the California court reaffirmed the position it had previously taken in Pacific Tel. & Tel. Co. v. Public Utilities Comm. 62 Cal. 2d 634, 661, 44 Cal. Rptr. 1, 18, 401 P. 2d 353, 370 (1965), where it had stated:

"* * * The determination of the commission in the present case that Western is entitled to no greater return on its sales to Pacific than Pacific is entitled to earn on its operations, and that American should not be permitted through the corporate instrument of Western to subject Pacific's ratepayers to the burden of providing a greater return, is based not only on extensive findings made by the commission on the subject but also on the methods and principle theretofore followed by the commission * * * and as the commission expressly found herein, produces a fair and reasonable result."

The court explained in the Los Angeles case:

"* * * We rejected Pacific's contention that it was error for the commission to omit 'to include a finding of fact as to the reasonableness or prudence of Pacific's purchases from Western and payment of the prices charged, * * *.' * * *

"We thus determined that, where it appears that a utility enjoys the dominant position shown by the commission's findings, it may not through the use of corporate instrumentalities obtain a greater rate of return than the utility would be entitled to in the absence of the separate corporate entities, and it was not determinative whether the prices charged by one affiliated corporation to another might be considered reasonable. In other words, the utility enterprise must be viewed as a whole without regard to the separate corporate entities, and the rate of return should be the same for the entire utility enterprise.

"We see no reason to depart from our holding. A corporation should not be permitted to break up the utility enterprise by the use of affiliated corporations and thereby obtain an increased rate of return for its activities. In the light of the dominance of the Bell System and its integrated position, we again reject the view that a finding of the reasonableness or prudence of Pacific's purchases from Western would warrant termination of the Western Electric adjustment." 7 Cal. 3d 343, 102 Cal. Rptr. 323, 497 P. 2d 795.

The New York Court of Appeals in Matter of General Tel. Co. v. Lundy, 17 N. Y. 2d 373, 378, 271 N. Y. S. 2d 216, 220, 218 N. E. 2d 274, 277 (1966), was dealing with the relationship between General Telephone and Electronics Corporation and wholly owned subsidiaries, one an operating company and the others suppliers. In an opinion by Judge Fuld, he stated:

"* * * [W]hen a utility and its suppliers are both owned and controlled by the same holding company, the safeguards provided by arm's-length bargaining are absent, and ever present is the danger that the utility will be charged exorbitant prices which will, by inclusion in its operating costs, become the predicate for excessive rates."

The court rejected the company's contention that the New York Public Service Commission lacked authority to investigate prices charged by affiliated suppliers. That authority, the court held, was implied from the ratemaking powers granted by the legislature to the commission. The result of such scrutiny is not to invalidate contracts entered with suppliers, but simply to "disregard unwarranted payments to affiliates when calculating the 'just and reasonable' rates which the telephone company will be permitted to charge to its subscribers." 17 N. Y. 2d 380, 271 N. Y. S. 2d 222, 218 N. E. 2d 278. The court declined to follow jurisdictions which gave weight to the fact that a regulated utility paid its affiliated supplier no more, and sometimes considerably less, than the suppliers received from independent tele-

phone companies not so affiliated. Because the affiliated companies enjoyed a combined bargaining power, the court was of the view that they could virtually dictate prices to be charged by their affiliated suppliers with the result that little weight could be given to price comparison in determining whether they were being overcharged by suppliers.

We subscribe to the views expressed by the New York court and reject the position of the California court that suppliers are held to the same rate of return as the telephone company. The New York court simply found authority in the Public Service Commission to make an independent inquiry into the propriety of amounts paid by the company to affiliated suppliers. Significantly, the court noted that such supplier's net return on investment varied from 19 percent to 56 percent, whereas the commission held that 12 percent was a reasonable rate of return. However, the rate base was apparently book value and not trended value.

We find support for our conclusion in State ex rel. Utilities Comm. v. General Tel. Co. 281 N. C. 318, 347, 189 S. E. 2d 705, 724. There, the court held that, inasmuch as there was no evidence that prices charged by the supplier to the affiliated phone company were so excessive as to indicate bad faith or mismanagement, the court found no reason to disallow expenses incurred in such purchases simply because the rate of return to the supplier was higher than that allowed the utility.[2]

We find no evidence in the record which suggests purchases from Western were not at a "prudent acquisition cost." If suppliers are to be regulated, it is the function of the legislature and not of the commission. However, as we have indicated, it is in-

---

[2] Contra, In the Matter of the Chesapeake and Potomac Tel. Co. CCH, Utilities L. Rep. par. 20,016. There the District of Columbia Public Service Commission held that the telephone company failed to sustain its burden of showing that Western Electric's prices were reasonable. As a consequence, the commission made allowance for this lack of proof in fixing a proper rate of return.

cumbent on the commission to scrutinize in depth prices paid by a utility to an affiliated supplier. At the same time, it seems to us unreasonable to arbitrarily penalize the company for doing business with an affiliate where there is no evidence that subscribers would benefit by the company's securing supplies elsewhere. That is not to say that if prices charged both by the affiliate and by its competitors are exorbitant and improperly reflect leverage obtained by monopolistic practices, the commission would not be warranted in disallowing what is excessive. To insure the proper discharge of the commission's statutory duties, and to provide a reviewing court with an adequate record, we hold that in future rate hearings the commission shall examine the propriety of expenses incurred in purchases from affiliates and make findings with such particularity as may be practical to comply with the rules we here adopt.

■ *Rate of return.* In its initial decision, the Public Service Commission found that 7.5 percent of *current value* was a fair rate of return for the company. In its petition for reargument before the commission, the state urged the commission to adopt as a rate of return 7.5 percent of *book value* which would yield additional gross revenues of $16.7 million and net earnings of $7.1 million. The state pointed out that by allowing a trended current value as the rate base, the commission was granting a rate of return of 8.9 percent on a book value of $523.8 million. The commission in its modified order, and the trial court on appeal, adhered to the 7.5 percent rate of return on current or trended value.

A summary of the testimony concerning rate of return is appropriate. Dr. Walter A. Morton, a professor, author, and lecturer on economics, called as an expert by the company, testified as follows:

"In my opinion, a fair rate of earnings on AT&T book common equity if it were applied to net book would be 12.15%.

"I reach this conclusion from consideration of the following factors: first, the need to maintain the real value of earnings

and dividends in the face of inflation; second, the present high interest rates in the capital markets; third, investors' reasonable expectations of dividend growth; fourth, the alternative opportunities in debt securities; fifth, the opportunity cost of AT&T equity capital as developed from analysis of the earnings and the market to book ratios in alternative equity investments; and sixth, comparison with other common stocks in their earnings rates, dividend payouts and dividend percentages to book equity.

"When a fair value rate base is used a lower return on the equity would be fair and reasonable—a matter which I would like to explain now.

\* \* \* \* \*

"I have previously said that I use the comparative earnings of industrials, their dividends and payouts as indicative of the cost of equity. All these percentages are percentages of book equity whereas we need a return for applicability to fair value.

"I have therefore made a study of the earnings of Moody's 125 industrials on their equity capital repriced by the Consumer Price Index. I have repriced the remaining plant just as it is done when a company reprices its remaining plant as of the end of the test year.

"My study shows that the repriced net plant of Moody's 125 industrials as of the year 1969 would be 114% of net book. \* \* \*

\* \* \* \* \*

"This exhibit shows how I derive the fair rate of return on equity which is applicable when a fair value rate base is used. The opportunity cost of equity capital to AT&T as I have shown, is 12.15% for application to an original cost rate base.

"I now desire to make an adjustment to this 12.15% for application to fair value. I do this by using the difference of 14% between the original cost of net plant and repriced cost for Moody's 125 industrials. I consequently adjust the 12.15% which is applicable to original cost downward to 12.15% divided by 114 times 100.

"Then I show numerically 12.15% times 100, divided by 114, equals 10.66%.

"This 10.66% adjusted equity cost is applicable to the equity for use with a fair value rate base. It will be composited with the imbedded cost of debt using the debt ratio to find the overall cost of capital and fair return to the Minnesota operations of Northwestern Bell applicable to fair value.

\* \* \* \* \*

"Exhibit No. 29-22 shows the overall fair rate of return to Northwestern Bell based upon the capital structure of the Bell System of $45 of debt and $55 of equity per $100 of total capitalization as of December 31, 1970.

"I use the imbedded cost of debt of 5.78% and the cost of equity for application to fair value of 10.66%. For each $100 of total capitalization the $45 of debt at 5.78% would cost $2.60.

"The $55 of equity at 10.66% would cost $5.86 for a total overall cost of capital of $8.46 or 8.45% for application to a fair value rate base.

"Rounding this figure, it is my opinion that 8.4% - 8.5% is the fair rate of return applicable to the fair value rate base of Northwestern Bell in this proceeding."

The state called Dr. Charles E. Olson, an associate professor in the Department of Business Administration at the University of Maryland. In determining the cost of common equity of AT&T, Dr. Olson used both the discounted cash flow approach and the earnings-price ratio method which he explained as follows:

"The discounted cash flow approach to estimating the cost of equity capital is based on the premise that the investor is buying two things when he purchases common stock—dividends and growth. Investors in American corporations have come to expect growth in earnings and dividends per share of common stock because of a public policy that is committed to increasing Gross National Product. In addition, the experience of most U.S. corporations since the end of World War II has been one of increased

dividends and earnings per share. The cost of equity capital using the discounted cash flow method is that discount rate which equates a given market price of a stock with the expected future flow of dividends.

"The earnings-price ratio approach to the estimation of the cost of equity capital assumes that the investor relates current earnings to the market price of common stock in making a decision on purchasing the stock. In other words, this method is premised on the assumption that investors are motivated by current earnings in relation to price. This approach is reasonable if current earnings are likely to approximate future earnings, given that rational investors consider future earnings. It should be recognized that some growth in earnings per share results from the reinvestment of earnings not paid out as dividends. If a company earns 9% on book equity, distributes two-thirds of it and reinvests one-third, book value per share will increase at 3% a year and so will earnings, other things being equal."

Applying these methods, Dr. Olson concluded that the commission should fix the cost of equity capital between 9.15 and 9.75 percent. He based his conclusions on the following considerations:

(1)  The earnings-price ratios of comparable utility groups;

(2)  The dividend yields and growth rates of six Bell System operating companies;

(3)  A discounted cash flow analysis of AT&T stock;

(4)  The recent earnings-price ratio experience of AT&T; and

(5)  The trends in bond interest rates.

On cross-examination, Dr. Olson conceded that the use of the discounted cash flow method and the earnings-price ratio would result in holding the market price down to book value. In other words, Dr. Olson proposed a rate of return which would tend to keep the value of the stock from appreciating in response to normal inflation.

The third expert, Mr. S. Del Low, a certified public accountant, was called as a commission consultant. He arrived at the cost of common equity of AT&T by the market value and the comparable earnings approaches, which he described as follows:

"This approach involves the selection of companies with somewhat comparable risk, a historical analysis of their earnings, and an assessment of the differences in risk between the companies selected and the regulated company under consideration. It assums that the greater the investment risk the greater the expected return."

Mr. Low concluded that the cost of equity to AT&T was between 10 percent and 11 percent and that a fair rate of return on a cost rate base would be between 7.5 percent and 8 percent. His testimony was colored by the fact that he was of the opinion that "[i]f the Company has a real desire to improve its return to its shareholders it can do so by financing future growth through debt and lower-cost preferred stock rather than common equity. * * * If the Commission determines that a fair value rate base should be used, I would adjust my recommended rates of return on a cost rate base by multiplying these rates by the ratio of the cost rate base to the fair value rate base."

The state here argues that Dr. Morton's testimony was uncorroborated, that he stressed investors' expectations as to dividend yield and growth, but neglected to utilize the discounted cash flow method and placed primary reliance on the opportunity cost-comparable earnings approach. In considering market values, Dr. Morton compared AT&T to Moody's 24 utilities and 125 industrials, Dow Jones 15 utilities and 30 industrials, and Standard and Poor's 55 utilities and 425 industrials. This, the state argues, is an unjustified comparison because the risks and uncertainties of AT&T do not approach those of industrials and other utilities. It was, therefore, error for the commission to rely on Dr. Morton's testimony, the state contends.

The commission's order of April 7, 1972, supplementing its

initial order of January 25, 1972, dealt in some depth with the rate-of-return issue. In rejecting Dr. Olson's recommendation for a return of 7.5 to 7.9 percent on book value, the commission made the following observation, with which we are in accord:

"* * * Dr. Olson acknowledged on cross-examination that his market value methods without adjustment to book value would force and maintain the market price at book level. This Commission is of the opinion that it is not its function to control the price of the stock of the companies which are subject to Commission regulation, and particularly not to attempt to maintain the market price of such companies' stocks at book value. If this Commission undertook to drive the market price of the stock of a regulated company to book value and it became necessary to issue additional stock at a price below book in order to market such stock it would have the effect of confiscating a part of the value of the property of existing stockholders. Thus the Commission is of the opinion that its overall rate of return of 7.50 must be applied to the fair value of Applicant's rate base which gives due consideration to cost and to current value of the Applicant's plant."

The commission went on to note that all of the witnesses acknowledged that the determination of a fair rate of return involved the exercise of informed judgment and was not susceptible of precise measurement; that they recognized the relationship between cost of equity and debt capital and used embedded cost of debt; and that each witness deemed it necessary to determine the cost of equity of American Telephone and Telegraph Company since Northwestern Bell was wholly owned by it. Finally, the commission was impressed by the fact that even after it authorized a rate increase, that rate was substantially lower than what had been granted for similar telephone service in a number of other states.

We have previously noted that the fixing of a fair rate of return cannot be determined with precision, since it is not derived

28

from a formula, but must be reached through the exercise of a reasonable judgment, applying the criteria to which we have referred. Ratemaking is a legislative and not a judicial function. In complex cases such as this, the court should, and does, accord the commission great deference in reviewing its decision. The rates fixed by the commission are presumed to be reasonable and just until the contrary is shown by clear and convincing evidence. In this area, the court's only function is to protect constitutional rights and not to substitute its own judgment for that of the commission. State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294 (1939); Minneapolis St. Ry. Co. v. City of Minneapolis, 251 Minn. 43, 72, 86 N. W. 2d 657, 676 (1957). We do not find a rate of return of 7.5 percent of trended value to be unjust, unreasonable, or discriminatory, and therefore affirm.

■ *Refund.* The effect of the trial court's order which we affirm was to remove from the rate base approved by the Public Service Commission $4.9 million, representing materials and supplies. The court remanded the proceedings to the commission to recompute revenue requirements and to determine an appropriate refund.

It is the position of the company that the commission has no authority to make a refund and that in any event it would be of no practical benefit to customers. Counsel estimated that the refund would amount to approximately a million dollars, would be distributed to more than a million subscribers, and after deducting the cost of distribution, would result in payments considerably less than a dollar per customer.

The company cites as authority Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co. 284 U. S. 370, 52 S. Ct. 183, 76 L. ed. 348 (1932); Mandel Bros. v. Chicago Tunnel Terminal Co. 2 Ill. 2d 205, 117 N. E. 2d 774 (1954); Straube v. Bowling Green Gas Co. 360 Mo. 132, 227 S. W. 2d 666 (1950). Without attempting to distinguish or discuss those cases in detail, it is enough to say that each construes a statute somewhat different from our own. We recognize that there is authority for the proposition

that ratemaking is a legislative process with some of the attributes of a statute and that rates which have been approved by a commission are valid until set aside. In jurisdictions adopting this rule, the reversal of a commission order increasing rates has only prospective effect. However, we think the better view was expressed in Mountain States T. & T. Co. v. Public Utilities Comm. 502 P. 2d 945, 949 (Colo. 1972), where the court allowed benefits, accruing as a result of a revision in its public utilities commission's order, to be passed on to telephone subscribers.

In scrutinizing the Minnesota statutes which govern telephone rates, we find no impediment to authorizing a refund. Minn. St. 237.06 declares that "[a]ll unreasonable rates, tolls, and charges are hereby declared to be unlawful." Section 237.08 prohibits a telephone company from collecting or receiving a greater or lesser rate than that on file with the Public Service Commission. We do not construe that statute to prevent a refund if the commission's order is ultimately found to be invalid. Section 237.25 deals with the trial court's scope of review. It provides in part: "[I]f the court finds that the order appealed from is unjust, unreasonable, and not supported by the evidence, it shall make such order to take the place of the order appealed from as is justified by the record before it."

Finally, § 237.26 provides:

"If no appeal is taken from any order of the department, as above provided, then in all litigation thereafter arising between the state and any telephone company or between private parties and any telephone company, the order shall be deemed final and conclusive."

Nothing in our statutes, unlike those in Illinois, for example, expressly deals with the question of whether new rates shall be enforced or suspended pending appeal. Nor do the statutes provide for segregating in a special fund amounts received under a new rate schedule pending a final decision on appeal. We con-

clude that the Minnesota statutes contemplate that only rates ultimately found to be reasonable shall be charged against subscribers and that amounts collected by a utility pending appeal enjoy no unique immunity from the claims of those to whom they rightfully belong.

We leave to the Public Service Commission the mechanics of determining the amount of refund which is due and the precise manner of its distribution. However, we believe no useful purpose would be served in attempting to make a cash refund to each subscriber who paid an excessive rate between the date of the commission's final order and the date of our decision. As a pragmatic alternative to ascertaining the identity and address of each subscriber overcharged during that period, we hold that it is proper for the commission to order the total amount of such overcharges to be paid only to those who are subscribers on the date the commission's amended order is entered in response to the remand which we now affirm. We further hold that in lieu of cash refunds the company is authorized to credit the accounts of such subscribers.

Affirmed.

MR. JUSTICE PETERSON and MR. JUSTICE MACLAUGHLIN took no part in the consideration or decision of this case.