**In the Matter of the Petitioner of CONTI-NENTAL TELEPHONE COMPANY OF MINNESOTA, INC., for Authority to Change its Schedule of Telephone Rates for Customers within the State of Minnesota.**

Nos. CX–84–1035, C7–84–1168.

Court of Appeals of Minnesota.

Nov. 13, 1984.

Hubert H. Humphrey, III, Atty. Gen., Thomas M. O'Hern, Jr., Sp. Asst. Atty. Gen., St. Paul, for intervenor-appellant, Atty. Gen., Residential Utilities Div.

Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent Minn. Public Utilities Com'n.

James D. Larson, Wurst, Pearson, Hamilton, Larson & Underwood, Minneapolis, for intervenor-appellant City of Mound.

Rebecca Palmer, Maslon, Edelman, Borman & Brand, Minneapolis, for intervenor-respondent Continental Telephone Co.

Susan Rester, Sp. Asst. Atty. Gen., St. Paul, for intervenor-respondent Dept. of Public Service.

Heard, considered and decided by POPOVICH, C.J., and PARKER and RANDALL, JJ.

## OPINION

POPOVICH, Chief Judge.

This is an appeal from an order issued by the Minnesota Public Utilities Commission

(PUC) on March 23, 1984 authorizing Continental Telephone Company of Minnesota (Continental) to increase its rate for telephone service in Minnesota.

The Residential Utilities Division of the Attorney General's Office (Attorney General), Department of Public Service (DPS), and City of Mound (Mound) intervened as parties to the proceeding.

On June 5, 1984, the PUC approved a refund plan to return the excess revenues collected during the interim rate period to Continental's customers.

The Attorney General appealed from that part of the PUC's order setting final rates which allowed Continental to earn a return on the cash unreserved account in the cash working capital portion of the rate base. Continental filed a notice of review in the Attorney General's appeal seeking review of the inclusion of bonded revenues in cash working capital and the rate of return allowed on common equity. The DPS filed a statement of the case addressing the issues raised by Continental.

Mound filed a separate appeal challenging interim rates and the refund order. By order dated July 12, 1984, this court consolidated the appeals. We affirm in part, reverse in part, and remand.

## FACTS

Continental, a wholly owned subsidiary of Continental Telcom, Inc., is the largest independent telephone company in Minnesota, serving 88,260 customers in 113 exchanges scattered throughout the state. It serves primarily rural, outstate exchanges, but also offers service to four metropolitan area exchanges, including the city of Mound.

On May 27, 1983, Continental filed a petition before the PUC pursuant to Minn.Stat. § 237.075 (1982) requesting authority to increase rates for telephone service in Minnesota by $7,212,120. The PUC accepted the filing and suspended rates on June 30, 1983. On July 7, 1983, the PUC authorized adoption of an interim rate increase of $4,785,629.

The Attorney General, DPS, and Mound petitioned to intervene in the contested case proceeding, and all were made parties on August 1, 1983.

Following public hearings and the issuance of the hearing examiner's report, the PUC granted Continental a $4,057,147 rate increase on March 23, 1984.

Subsequently, the Attorney General petitioned the PUC to reconsider its decision regarding the treatment of the cash unreserved account. Continental filed a conditional petition for reconsideration requesting the PUC to consider Continental's petition regarding bonded revenues and return on equity if it granted the Attorney General's petition. On May 14, 1984, the PUC denied both petitions for reconsideration.

On June 5, 1984, the PUC approved a refund plan to return the excess revenues collected during the interim rate period to Continental's customers. Mound petitioned the PUC to reconsider its refund decision. The PUC denied the petition on August 1, 1984.

Upon petition of the Attorney General, this court issued a writ of certiorari on June 12, 1984. On June 27, 1984, Continental filed a notice of review pursuant to Minn.R.Civ.App.P. 106 seeking review of portions of the final order concerning bonded revenues and return on equity. In response to Continental's action, the DPS intervened. Mound petitioned this court for a writ of certiorari regarding the refund plan on July 3, 1984.

## ISSUES

1. Has Continental's failure to file a petition for writ of certiorari deprived this court of jurisdiction to consider its appeal?

2. Is the PUC's conclusion that the cash unreserved account should be included in cash working capital without a corresponding addition of earned interest to Continental's revenues supported by substantial evidence?

3. Is the PUC's conclusion that bonded revenue was to be included in the computa-

tion of cash working capital supported by substantial evidence?

4. Is the PUC's conclusion that 14.53% is a reasonable return on equity for Continental supported by substantial evidence?

5. Did the PUC err in calculating interim rates for the metro class of Continental's customers?

6. Did the PUC err in adopting a refund plan that returns excess revenues collected during the interim rate period to all rate payers on an equal percentage basis?

### ANALYSIS

1. *Scope of review.*

Appellate review of administrative agency decisions is governed by Minn.Stat. § 14.69 (1982), which provides:

In a judicial review under sections 14.-63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

*Id.*

■ Accompanying the statutory standards is a presumption that agency decisions are correct, "out of deference to agency skill and technical expertise * * *." *Crookston Cattle Co. v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 777 (Minn.1980) (citing *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977)); *see also Minnesota Power & Light Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 324, 329 (Minn.1983).

■ The substantial evidence test is used to review factual findings of an agency. *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 348, 351 (Minn.Ct.App.1983), *pet. for rev. denied*, (Minn. April 24, 1984). Substantial evidence is defined as:

1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than 'some evidence'; 4) more than 'any evidence'; and 5) evidence considered in its entirety. There are correlative rules or principles that must be recognized by a reviewing court, such as: 1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) a substantial judicial deference to the fact-finding processes of the administrative agency; and 3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety.

*Reserve Mining Co. v. Herbst*, 256 N.W.2d at 825.

■ A separate basis for rejecting an agency's decision is the arbitrary or capricious standard. *Peoples*, 342 N.W.2d at 351. Where an agency's decision represents its judgment, and not its will, the agency has not acted arbitrarily. *Id.* at 352; *see also Markwardt v. State Water Resources Board*, 254 N.W.2d 371, 374 (Minn.1977). Furthermore, an agency's decision is not arbitrary or capricious if more than one opinion exists on the matter. *See Village of Goodview v. Winona Area Industrial Development Association*, 289 Minn. 378, 381, 184 N.W.2d 662, 664 (1971).

2. *Continental's failure to file a writ of certiorari.*

■ The Attorney General petitioned for writ of certiorari on June 12, 1984. Pursuant to Minn.R.Civ.App.P. 106, Continental filed a notice of review raising two addi-

tional issues. The PUC argues that under Minn.Stat. § 14.64 (Supp.1983), filing a timely petition for writ of certiorari is the only way to obtain review. Since Continental did not do so, they contend this court does not have jurisdiction to consider these additional issues.

Minn.Stat. § 14.64 (Supp.1983) states:

Proceedings for review under sections 14.63 to 14.68 *shall be instituted* by serving a petition for a writ of certiorari * * * and the matter shall proceed in the manner provided by the rules of civil appellate procedure.

*Id.* (emphasis added).

Parties participating in proceedings under the Minnesota Administrative Procedure Act are permitted to raise additional issues under Rule 106. Once a party institutes proceedings for review under Minn. Stat. § 14.64, the rules of civil appellate procedure apply, including Rule 106.

Raising additional issues by notice of review was allowed under the old statutory practice. *See Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 9 (Minn.1980); *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 216 N.W.2d 841, 845 (1974) (in both cases the Minnesota Supreme Court considered issues raised by notice of review). Nothing in the new rules of civil appellate procedure denies cross appeal by notice of review.

This interpretation serves the interests of simplicity and judicial economy since the necessity for parties filing multiple defensive appeals is thereby avoided. We hold since the Attorney General filed a petition for writ of certiorari under Minn.Stat. § 14.64, Continental, as a responding party properly raised additional issues by filing a notice of review.

### 3. *Cash Unreserved Account.*

■ In making its final rate determination, the PUC computed Continental's rate base using the thirteen month average balance sheet method. The balance sheet approach compares current assets and current liabilities adjusted only for nonrecurring aberrations and liabilities owed to in-

vestors. Cash working capital is included in Continental's rate base in order to allow a return on investor supplied funds used to carry on the day-to-day activities of the business.

The cash unreserved account is included on Continental's balance sheet among current assets and represents current funds available for use on demand. The account contained approximately $5.2 million at the time of the hearing, but the record only contains information for this account for the first one-half of the test year. The average monthly balance of the cash unreserved account for the period January 1983 through June 1983 was $7,054,715. The interest earned on the cash unreserved account was $345,309.61 for the same period. The interest earned on this account is recorded on Continental's income statement as "Other Miscellaneous Income," which is being recorded below-the-line for the benefit of shareholders (that is, it is being excluded from Continental's operating income statement).

The PUC included the cash unreserved account in the company's cash working capital portion of rate base without including interest income attributable to these funds in the company's revenues. It found that:

[T]he cash unreserved account is a current asset properly included in determining cash working capital under the balance sheet method. However, without sufficient information about this account, it cannot properly be determined if the company is earning a double return on this account and the dollar amount of the alleged double return. Because of the lack of substantiating evidence on this issue, the Commission will allow the inclusion of the cash unreserved account in determining the test year cash working capital without making an adjustment as urged by the RUD [Attorney General] for a double return.

Final Order at 7.

The Attorney General argues, since the cash unreserved account is included in rate base working capital, the interest revenues

should also be included to prevent Continental from earning a double return on the account. He claims there is sufficient evidence in the record to ascertain the amount of income Continental is earning on this account.

The Attorney General cites nine facts to establish Continental is earning a double return on its cash unreserved account. The record, however, shows only interest received for one-half of the test year. The PUC argues that without being able to determine the amount of interest revenues for the whole year, it had no evidence to support including a sum in the company's revenues attributable to the interest from the cash unreserved account.

There is also little evidence of how the interest income should be treated for ratemaking purposes. The PUC chose not to decide this issue because the record was inadequate to resolve the question.

The financial adjustment urged by the Attorney General requires a factual determination which must be supported by substantial evidence. *Hibbing Taconite Co.,* 302 N.W.2d at 9. We agree the record does not contain sufficient evidence for the PUC to make the suggested adjustment to cash working capital. The PUC, however, cannot ignore facts suggesting a double return on the cash unreserved account and avoid deciding the proper ratemaking treatment to be given the interest income. Therefore, we remand the matter to the PUC for proceedings to obtain evidence to support a reasoned decision.

### 4. *Bonded Revenue.*

█ Bonded revenues are collected under bond from interim rates and included as current liabilities on Continental's balance sheet. Since the test period under review covers a period when revenues were subject to refund under the company's previous rate case, the revenues collected under bond appear as a current liability. During the current matter, the company again collected interim rates subject to refund at the time of the PUC's final decision.

The PUC found bonded revenues should be included among the liability accounts used to determine cash working capital under the balance sheet method, concluding:

Because bonded revenues and interim rates serve a similar purpose, and because there is no valid accounting distinction between bonded revenues with the last rate case and the interim rates under bond in this case, the Commission finds that the bonded revenue account included in the cash working capital balance sheet is a recurring item properly included as a liability account for cash working capital purposes, and that revenues under bond are ratepayer funds until the Commission's final determination in a rate case.

Final Order at 10.

Continental contends this finding is incorrect because bonded revenue is a nonrecurring item and because a substantial portion belongs to investors.

Continental filed rate cases in 1979, 1981, 1983, and may do so in the future. In each case, it records the contingent interim revenue increase to the bonded revenue account. The presence of the bonded revenues from the last Continental rate case on the books examined for this matter is indicative of the regularity of Continental's rate case filings. The record supports the PUC's conclusion and determination on this issue.

### 5. *Rate of return on common equity.*

The PUC heard testimony from three expert witnesses regarding the rate of return on common equity: Mr. Morris for Continental who recommended a return of 16.75%; Dr. Thompson for the DPS who recommended as an upper limit a return of 14.75%; and Mr. Schmidt for the Attorney General who recommended a return of 14.10%.

The PUC calculated the return on equity by the "discounted cash flow (DCF) method," which involves summing the dividend yield of a company's stock with the expected dividend growth rate for that stock. The PUC applied the DCF analysis to data

from Continental Telcom, Inc. and a group of risk comparable companies to determine the dividend yield component of the DCF formula, giving equal weight to each and arrived at a figure of 8.85%. There is no dispute about this figure.

In determining the growth rate, the PUC adopted the hearing examiner's method which involved averaging the midpoints of the ranges of growth rate estimates made by Dr. Thompson for Continental Telecom, Inc. and a comparable group. The PUC used this method because it gives equal weight to the data of both groups and is consistent with the approach used to determine an appropriate dividend yield. Using this method, the PUC arrived at a growth rate of 5.68%. Summing the dividend yield of 8.85% and the expected growth rate of 5.68% yields a 14.53% return on common equity.

Continental disputes the growth rate used to determine the rate of return allowed.

The traditional substantial evidence standard is difficult to apply to a determination of growth rate because this decision is highly judgmental. *See Minnesota Power & Light Company*, 342 N.W.2d at 330. The reviewing court must "determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Id.*

Here, the PUC explained in detail how it arrived at the growth rate and its conclusion is supported by substantial evidence.

Continental's main concern is that the PUC adopted the hearing examiner's recommended growth rate. The hearing examiner used the lowest estimates in setting the rate of return because evidence indicated quality of service problems. The PUC stated it did not consider the quality of service factor in determining the appropriate growth rate, but arrived at the same figure proposed by the hearing examiner. We believe the assigned growth rate is adequately supported by the record, independent of quality of service factors.

6. *Calculation of interim rates for metro customers.*

Before the filing, Continental had three customer groups: metro, non-metro (large), and non-metro (small). Continental charged its non-metro customers a basic service rate plus an "extended area service" (EAS) component. Metro exchange customers were charged only a basic service rate, but an EAS component was implicit in this rate. Continental's filing stated an increase in EAS rates would not be proposed.

The PUC set interim rates for Continental on July 7, 1983. Those rates were to produce an interim revenue increase of $4,785,629 and collected using an across-the-board increase to existing basic service rates. The difference between the contents of the rates was not known to the PUC at the time the interim rate order was issued but did become apparent during the hearings.

The interim rates increased metro and non-metro line access rates by 29.3%. The increase was applied to the total metro rate (basic service and EAS) but only to the basic service portion of the non-metro rate. Thus, metro customers paid a higher interim rate than non-metro customers.

In its final order, the PUC directed Continental to apply the permanent rate increase only to the basic service portion of the metro rate, which corresponded to the increase applied to the basic service rates in the non-metro exchanges.

The final rates ordered were below interim rates. The differences between rates paid before and after the final rate increase by the three customer groups are as follows:

| | Existing | Interim | Final |
|---|---|---|---|
| Metro | 21.90 | 28.30 | 24.45 |
| Non-Metro (large) | 13.80 | 17.85 | 16.35 |
| Non-Metro (small) | 12.55 | 16.25 | 16.36 |

The metro figures include $8.10 per month for EAS. Non-metro customers paid a separate EAS charge which would be added to the amount shown.

Continental was required to file a refund plan and submitted a two option plan. Option A proposed a return of the excess interim revenues only to those groups of customers whose final rates were lower than the interim rates. Option B proposed a return of the excess interim revenues to all customers equally. The Attorney General and the DPS supported Option B; Mound did not comment. On June 5, 1984, the PUC issued a refund order based upon Option B. Mound then petitioned the PUC for reconsideration on grounds an equal percentage refund was unfair to metro customers. Mound appealed the denial of their petition.

(a) *Timeliness of Mound's appeal.*

■ The PUC contends Mound did not raise the issue earlier when it could have and its attempt to raise it by reconsideration of the refund plan is untimely.

The discrepancy between the metro and non-metro interim rates became apparent during the contested case hearings. Mount claims the issue was previously raised in briefs and oral argument. Mound believed the PUC recognized the error and intended to address it in the refund order. When it became apparent metro customers would not be reimbursed for the amount charged to the EAS component of their total rate, Mound made a timely request for reconsideration of the refunding order.

(b) *Error in setting the interim rates.*

■ Mound contends the PUC erred in setting the interim rates because, contrary to its own previous practice, it did not raise all customer groups' rates by the same percentage. In its Statement of Policy on Interim Rates issued April 14, 1982, the PUC stated:

The Commission interprets that * * * interim rates should consist of the existing rate schedule with an interim rate adjustment equal to the overall requested interim increase percentage. This procedure will assure that consumption decisions will be made on the same basis as under existing rates and will allow refunds, if

necessary, to be made across the board to all customers such that the final rates are prospective only.

The PUC contends it did not mistakenly increase the interim EAS rates for metro exchanges since there were no recognized EAS charges in the rate design for the metro exchanges when the interim rates were ordered. It claims to have purposefully applied the across-the-board interim increase to the basic service rate and did not decide to restructure the rate design to recognize an *implicit* EAS component in the metro exchange rates until after the hearings. The PUC contends it complied with Minn.Stat. § 237.075, subd. 3 (Supp. 1983) and maintained the existing rate design during the interim period.

We agree with Mound that the increase to metro EAS rates during the interim period was not a rate design change, but an error which violated the PUC's policy of applying the interim rate to all customers equally.

7. *The Refund Plan.*

Minn.Stat. § 237.075, subd. 3 (Supp.1983) provides:

If, at the time of its final determination, the commission finds that the interim rates are in excess of the rates in the final determination, the commission shall order the company to refund the excess amount collected under the interim rate schedule * * *.

*Id.*

The PUC refund plan would refund excess interim rates to all customers equally including the non-metro (small) group whose interim rates were a dime below final rates. This would reduce the amount available for refunding to the two rate groups whose interim rates were above final rates.

The legislature granted the PUC broad discretion in determining the details of refund plans. *See* Minn.Stat. § 237.075, subd. 3 (Supp.1983). The PUC argues it reasonably exercised its discretion by adopting a policy of across-the-board re-

funds that is fair and reasonable in virtually all cases. The PUC also claims to have followed the directive of Minn.Stat. § 237.-075, subd. 5 (1982), which provides:

> Rate design changes shall be prospective from the effective date of the new rate schedules approved by the commission.

*Id.*

Finally, the PUC contends its across-the-board refund plan complies with the legislature's intention to provide a simple system for refunding excess revenues collected during the interim period and avoids the controversy and dissatisfaction of complex refund designs.

The PUC policy of granting equal percentage interim rate increases and refunds to all may be simple, but ignores that interim rates were unfair to metro customers. The PUC does have broad discretion, but is also required to achieve a fair and reasonable result. *See* Minn.Stat. § 237.06 (1982). The PUC cannot arbitrarily disregard the reasonableness of the interim rates. The interim rates were in effect for eleven months. Continental has a history of filing for rate increases every other year. If this pattern continues, Continental ratepayers will be paying interim rates almost half of the time. If there is no PUC requirement to set these interim rates at a fair and reasonable level, the potential exists for customers to pay unequal rates at least half of the time.

The PUC claims its refund method places a significant burden on Continental. The burden, however, appears to be overstated. Continental itself submitted a proposed refund plan that would be more equitable. Each metro customer paid more each month than he or she should have during the interim rate period. This overpayment can be returned to participating metro customers through bill credits. Continental indicated it can do this and has kept records to enable it to do so. Other parties are not involved and customers will not be burdened.

We hold that each metro class customer who received service during the period interim rates were collected, should receive a refund for the amount they overpaid due to the eleven month EAS overcharge. The remaining amount overpaid by metro and non-metro (large) customers during the interim period should be refunded to them and the non-metro (small) customers should not receive any refund since they were not overcharged. Any refunds already made to non-metro (small) customers may be recovered and paid to customers who were overcharged.

## DECISION

This court has jurisdiction to hear the additional issues raised by Continental in its notice of review. The PUC's decision regarding the cash unreserved account was not supported by substantial evidence. We remand to the PUC for appropriate proceedings to determine if Continental is earning a double return on the account and the treatment to be applied to the interest income.

The PUC's decision to include bonded revenue in cash working capital and its conclusion that 14.53% is a reasonable return on equity was supported by substantial evidence and is affirmed.

The PUC erred in calculating interim rates and its decision to return excess revenues to all ratepayers on an equal basis is reversed. We remand to the PUC to supervise the administration of a refund plan that complies with this decision.

Affirmed in part, reversed in part, and remanded in part.