**In the Matter of the Application of NORTHWESTERN BELL TELEPHONE COMPANY, Minneapolis, Minnesota for Authority To Change its Schedule of Telephone Rates for Customers Within the State of Minnesota.**

**Nos. C4–84–1872, C8–84–1888.**

Court of Appeals of Minnesota.

May 14, 1985.

Linda Anthony, St. Paul, for Dept. of Public Services.

J. Walter Byer, III, Aurora, Colo., Robert J. Hennessey, Minneapolis, for U.S. West Direct.

Randall Young, St. Paul, for Minnesota Public Utilities Com'n.

Michael J. Bradley, St. Paul, for Residential Consumer Utility Unit.

Lawrence R. McDonough, Little Falls, for Polly Vesser.

Elissa Mautner, St. Paul, for Ramsey County.

Donald Greeley, Director, St. Paul, for Minnesota Senior Federation.

Larry D. Starns, St. Paul, for Minnesota Dept. of Admin.

Dellon E. Coker, Falls Church, Va., for Federal Executive Agencies.

Glenn E. Purdue, Minneapolis, for Suburban Rate Authority.

Keren Fisher, Minneapolis, James A. Gallagher, Minneapolis, for Northwestern Bell Telephone Co.

Carla Kjellberg, Minneapolis, for Minnesota Public Interest Group.

Elliot Rothenberg, Minneapolis, for North Star Legal Foundation.

Carol J. Casebolt, Legal Aid Soc. of Mpls., Inc., Minneapolis, for Recipient Families United for Justice.

John B. Vandenorth, Jr., St. Paul, for NewVector Communications, Inc. and AT&T Communication of Midwest.

Dwight Whitley, Bellevue, Wash., for NewVector Communications, Inc.

William E. Flynn, Minneapolis, for Minnesota Business Utility Users Council.

Eldon J. Spencer, Jr., St. Paul, for Coalition of FX Users.

Victor J. Toth, Reston, Va. for Telecommunications Ass'n of Minnesota.

Evan J. Henry, pro se.

Russell L. Doty, Jr., St. Paul, for Minnesota Radio Common Carriers Ass'n.

Tony Perpich, St. Paul, for Dept. of Energy and Economic Development.

Hubert H. Humphrey, III, Atty. Gen., Susan W. Rester, Office of Atty. Gen., St. Paul, for State.

Heard, considered and decided by POPOVICH, C.J., and NIERENGARTEN and CRIPPEN, JJ.

## OPINION

NIERENGARTEN, Judge.

Northwestern Bell filed a rate increase petition on September 29, 1983, with the Minnesota Public Utilities Commission. The Commission issued its Findings of Fact, Conclusions of Law and Order dated July 27, 1984, which (1) voided an agreement transferring Northwestern's directory operations, (2) adjusted Northwestern's tax liability so as to compensate for lost

income tax credits and (3) required Northwestern to comply with future filing requirements. The Commission's Order After Reconsideration and Rehearing dated September 26, 1984, stayed portions of its earlier order pending a determination of the issues raised in this appeal. We affirm in part, reverse in part and remand.

## FACTS

### Directory transfer

A few months after it filed its rate petition, Northwestern notified the Commission it had entered into a publishing agreement to transfer its directory operations to Landmark Publishing Co., a subsidiary of U.S. West, Northwestern's parent company. The operations were then transferred to U.S. West Direct, which is also owned by Landmark Publishing. U.S. West Direct is in the directory publishing and advertising business and was to undertake the publication of directories for Northwestern's customers. Prior to this agreement, Northwestern published all of its own directories.

Directory advertising includes the yellow pages. Under the terms of the contract, Northwestern transferred approximately $25,000,000 in liquid assets in exchange for West Direct's promise to pay publishing and transition fees to Northwestern. On the effective date of the contract, the employees of Northwestern's directory division became employees of West Direct.

The rate base revenues and expense data regarding directory operations is currently included in Northwestern's filing as though such operations had not been transferred.

On June 19, 1984, the administrative law judge (ALJ) issued his recommended findings. He found "[t]here was substantial evidence in the record from which it can be determined that the imputation of revenue to [Northwestern] as a consequence of the affiliated transactions is appropriate" but that Northwestern failed to provide competent evidence with which to determine the amount of revenue to be attributed. The ALJ therefore recommended that the Commission order Northwestern to "maintain

records from which the precise effects of the transfer of assets and affiliated transactions can be determined for subsequent rate-making proceedings." As a consequence of the transfer and receipt of publishing fees, the ALJ recommended that Northwestern's income be increased by $2,526,666.

More importantly, he concluded Northwestern's transfer of assets did not require the prior approval of the Commission under Minn.Stat. § 237.23 (1984) and that the "Commission has no statutory authority with respect to the negation of affiliated transactions of a telephone company similar to that exercised with respect to public utilities * * *, as reflected in Minn.Stat. § 216B.48 (1983 Supp.)." He reasoned that section 237.23 related only to the transfer of the assets of one regulated telephone company to another regulated telephone company and that West Direct was not a telephone company. He concluded, however, that reporting requirements could be imposed on Northwestern and that the Commission could review affiliated contracts for their future impact upon rate-making.

In its July 27 order, the Commission rejected a portion of the ALJ's recommended findings and voided the transfer of directory operations and associated assets from Northwestern to West Direct because the transfer was not shown to be in the public interest. The Commission argues there was only a transfer of profits from Northwestern to West Direct and, as a result, Northwestern will suffer a significant revenue loss. It ordered that "directory operations and associated assets shall be returned [from West Direct] to and retained by Northwestern Bell Telephone Company," basing its authority on section 237.23.

On September 26, 1984, the Commission issued its Order After Reconsideration and Rehearing reaffirming its earlier order but stayed certain portions of its earlier order. The stay did not include Northwestern's obligation to keep accurate records.

*Investment Tax Credit*

On January 1, 1984, AT&T divested itself of the Bell Operating Companies pursuant to a modified final judgment and a formal plan of reorganization as part of the settlement of a federal antitrust suit. *See United States v. American Telephone and Telegraph Co.,* 552 F.Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *see also United States v. Western Electric Co.,* 569 F.Supp. 1057 (D.D.C.), *aff'd sub nom. California v. United States,* — U.S. —, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

As part of this litigation, Northwestern was required to transfer interexchange telecommunication assets and customer premise equipment (CPE), as well as the unamortized investment tax credits (ITCs) associated with the assets, to AT&T Communications of the Midwest (ATTCOM) and AT&T Information Systems (ATTIS), respectively. Investment tax credits represent a forgiveness by the federal government of federal income tax for the purpose of encouraging investment in plant and equipment. Northwestern's ITCs are governed by section 46(f)(2) of the Internal Revenue Code. Under this provision, no tax forgiveness is granted in the year of the tax credit. Instead, the tax savings is amortized and returned to the ratepayer in the form of lower utility rates over the life of the asset whose investment generated the credit. This is referred to as income tax normalization. The difference between the taxes Northwestern actually paid and the tax expense it shows on its regulated books is credited to a deferred tax account or reserve.

Since Northwestern no longer owned the unamortized ITCs, the ratepayers would never reap the benefits associated with ITCs in the form of lower utility rates. The Attorney General, therefore, recommended that Northwestern's tax expense for ratemaking purposes be adjusted so that the ratepayers would not suffer any loss due to the transfer of the ITCs. The Commission, as well as the administrative law judge, agreed and accordingly ordered Northwestern to amortize and return to its ratepayers the unamortized ITCs which were transferred to AT&T as required by the FCC and federal court. The Commission accomplished this by reducing Northwestern's test year income by $848,000 and ordered similar adjustments over a ten year period.

*Future Filing Requirement*

In its July order, the Commission ordered Northwestern to include in all future rate case filings a description of "the present and proposed test year revenues, and the present and proposed test year number of customers or revenue producing units, for all major categories of service provided to customers or exchange access provided to other carriers." Northwestern claims this order imposed unlawful future filing requirements upon Northwestern without going through "established rule making procedures."

## ISSUES

1. Did the agreement between Northwestern and its affiliate West Direct require the prior approval of the Commission?

2. Is the Commission's order adjusting Northwestern's tax liability correct in light of the FCC and federal court decisions requiring Northwestern to transfer its investment tax credits to AT&T?

3. Does the Commission have the authority to require Northwestern to include information on categories for which Northwestern proposes no rate change in its future rate increase filings?

## ANALYSIS

*Standard of Review*

 Agency decisions "enjoy a presumption of correctness, and deference should be shown by the courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.

1977). In reviewing decisions of an agency, the substantial evidence test is applied. *Signal Delivery Service, Inc. v. Brynwood Transfer Co.*, 288 N.W.2d 707, 710 (Minn. 1980). For Minnesota's interpretation of the substantial evidence test, see *Reserve Mining*, 256 N.W.2d at 825.

▪ An agency's findings can also be rejected when they are arbitrary and capricious. "An agency finding is arbitrary and capricious when its determination represents its will and not its judgment." *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 348, 351 (Minn.Ct.App.1983), *pet. for rev. denied*, (Minn. April 24, 1984).

## I

Northwestern Bell and U.S. West Direct argue that their contract did not require the prior approval of the Commission. The Commission invoked jurisdiction pursuant to Minn.Stat. § 237.23 (1982), which provides:

> It shall be unlawful for any tele*phone company*, corporation, person, partnership, or association subject to the provisions of this chapter *to purchase or acquire the property * * ** or the franchises, rights, privileges, and immunities *of any telephone company doing business within the state without first obtaining the consent of the commission thereto;* and telephone companies, corporations, persons, partnerships, or associations are hereby given the right with the consent of the commission to purchase and acquire the property * * * together with all franchises, rights, privileges, and immunities owned or enjoyed by said companies. The owner and the proposed purchaser of said property shall both join in the application filed with the commission for the approval of such transfer, and in the case of a corporation desiring to sell all of its property it shall require a vote of a majority of its stockholders to ratify the same. *Telephone companies may sell and dispose of any property not used by said telephone companies in the conduct of their business at the* *time of the sale without the consent of the commission.*

*Id.* (emphasis added).

The Commission reads section 237.23 literally to apply not only to telephone companies but also to any "corporation, person, partnership, or association * * *." These entities, however, are modified by the phrase "subject to the provisions of this chapter." Chapter 237 is "designed to deal with the specialized problems of public-utility telephone companies." *Minnesota Microwave, Inc. v. Public Service Commission*, 291 Minn. 241, 250, 190 N.W.2d 661, 667 (1971). West Direct is only in the business of publishing directories. It was conceded on appeal that West Direct is not a telephone company. Other jurisdictions have generally held that "publication of the classified directory, however, is wholly a matter of private contract and contracts relating thereto are not required to be filed with the Public Service Commission * * *." *McTighe v. New England Telephone & Telegraph Co.*, 216 F.2d 26, 27 (2nd Cir. 1954).

In *In re Petition of United Telephone Company*, Docket No. P–430/GR–82–200 (Minn.P.U.C. April 27, 1983), the Commission did not claim to have jurisdiction over a third-party publishing contract and stated that "[n]o one would suggest that the advertising appearing in United's classified section constitutes the furnishing of telephone service to the public." *Id.*, slip op. at 9. The only issue remaining, therefore, is whether the last sentence of section 237.23 applies to a sale of property by a telephone company to an unregulated publisher of directories.

▪ The final sentence refers back to the sale between telephone companies discussed in the first paragraph of the statute and makes it possible for one telephone company to sell property to another telephone company without prior commission approval if the property transferred was not used in the conduct of the seller's business. It does not prohibit, as is argued by the Commission, the sale of any asset by a

telephone company to a non-telephone company. To hold otherwise would render superfluous the first sentence of that section. *See* Minn.Stat. § 645.17(2) (1984) (legislature intends the entire statute to be effective). Since West Direct is not a telephone company, the last sentence of section 237.-23 does not apply to this case.

■ The legislature has never granted the Commission jurisdiction over transactions between telephone companies and their affiliates. Prior approval power has been granted for transactions between a public utility (which does not include a telephone company) and their affiliates. *See* Minn.Stat. § 216B.48 (1984). An effort in 1984 to include such a provision in the telephone statutes failed. Thus, the legislature evidently never intended the Commission to have prior approval authority over transactions between telephone companies and their affiliates.

■ The Commission's hands aren't completely tied. If it decides the contract was not in the best interests of the ratepayer and that the fees paid by West Direct to Northwestern were unreasonable, it can make an adjustment to Northwestern's rate request. In *Northwestern Bell Telephone Co. v. State*, 299 Minn. 1, 216 N.W.2d 841 (1974), the supreme court held the Commission had authority to investigate prices charged by affiliated suppliers. It pointed out that the remedy is not to invalidate the supply contracts, "but simply to 'disregard unwarranted payments to affiliates when calculating the "just and reasonable" rates which the telephone company will be permitted to charge to its subscribers.'" *Id.* at 20, 216 N.W.2d at 853–54.

The Commission can investigate the reasonableness of the publishing fees paid by West Direct to Northwestern pursuant to its inherent power to include the expenses, revenues and investments related to directory advertising in telephone company ratemaking proceedings. The Commission's authority is limited to either accepting or rejecting the ALJ's recommendation of imputing income to Northwestern.

■ Respondent Minnesota Business Utility Users Council argues Minn.Stat. § 237.081, subd. 4 (1982) grants the Commission prior approval authority in this situation. Section 237.081 gives the Commission the authority to make an order regarding the reasonableness of any "practice, act or omission affecting or relating to the production, transmission, delivery or furnishing of telephone service or any service in connection therewith * * *." *Id.* First, the Commission did not rely heavily on this statutory provision as a basis for its jurisdiction. Second, this provision does not grant the Commission prior approval authority; only the power to make an order regarding the contract's reasonableness. If the contract is found to be unreasonable, the appropriate remedy is to make an adjustment to the telephone company's rate base. *See Northwestern Bell,* 299 Minn. at 20, 216 N.W.2d at 853–54. Last, only the publishing of white pages would come under this provision. The publishing of yellow pages is not a required service.

Since the Commission did not have the authority to void the transfer, the other issues raised need not be addressed.

## II

The Commission ordered Northwestern to amortize and return to its ratepayers the value of unamortized ITCs which were transferred to AT&T by reducing Northwestern's tax liability. Northwestern argues the Commission's order is in direct conflict with federal regulatory goals. The Commission argues the adjustment was necessary to prevent an injustice that would otherwise occur to the ratepayers. It claims the source of the funds created by the ITCs was the ratepayers and that "those funds were paid under the implied promise that they would be returned to the ratepayers." We disagree.

In a decision issued December 15, 1983, the FCC ruled that unamortized ITCs should be transferred with the assets that generated the credits and rejected the argument that "it would be more equitable to

return those savings [generated by the ITCs] to ratepayers by requiring the [Bell Operating Companies] to retain the unamortized credits and use them to reduce their tax expenses for ratemaking purposes." *In re Second Computer Inquiry*, 95 F.C. C.2d 1276, 1359 (1983). The FCC justified its conclusion as follows:

> We conclude that such a transfer would be consistent with the intent of Congress in providing for the tax benefits of accelerated depreciation and investment credits for regulated utilities and with underlying accounting standards. Furthermore, we conclude that the transfer of those accounts would not work an inequity on ratepayers * * *, nor bestow unfair competitive advantages on ATTIS in the CPE marketplace. On the other hand, there is a substantial risk that retention of those accounts by the BOCs [Bell Operating Companies] (to be used to reduce rates after the associated assets have been removed from the regulated books) would violate the requirements of the Internal Revenue Code * * with serious adverse tax consequences for the BOCs, resulting in financial burdens for those companies and their ratepayers. * * *

*Id.* at 1360.

The actual source of the funds made available to Northwestern for investment purposes was the United States Treasury, not the ratepayers. The FCC stated:

> The relevant Code provisions and their legislative history indicate that Congress viewed ITCs as Treasury-supplied subsidies provided to certain taxpayers, including public utilities, to stimulate investment by those taxpayers in productive assets. Further, there is absolutely no indication in either the Code or the legislative history that Congress viewed the restrictions on utilities flowing through ITCs to ratepayers contained in Section 46(f) as a means of extracting tax "overpayments" from ratepayers to provide that investment subsidy. Rather, those restrictions reflect a Congressional view that the ITCs, as funds supplied by the Treasury to stimulate invest-

ment, should not be passed on immediately to utility customers, which would only stimulate consumption.

*Id.* at 1408 (footnotes omitted).

In *Office of Public Counsellor v. Indiana & Michigan Electric Co.*, 416 N.E.2d 161 (Ind.App.1981), the court stated that ITCs were "not to be used simply to reduce the utility's customers' costs." *Id.* at 172. Instead, it was to stimulate investment "with both the utility's investors and its ratepayers sharing in the benefits of the credit." *Id.* It was not, as is argued by the Commission, simply intended to reduce the ratepayers' costs.

Additionally, the continued use of an ITC by Northwestern to reduce the cost of service after the transfer of the associated asset would violate Internal Revenue Code section 46(f)(2). In a letter ruling issued in December 1983, the IRS ruled:

> The balance of the unamortized investment tax credit * * * with respect to the transferred property should be removed from the transferor's books to reflect the assignment of the property and no portion of such unamortized investment tax credit may be used to reduce the transferor's cost of service or rate base under section 46(f)(2).

Letter from Internal Revenue Service to Martin J. Eisen, General Tax Attorney, AT&T (December 29, 1983) (response to a request for a ruling letter).

The Commission's order adjusts Northwestern's tax liability to reflect what would have occurred had the ITCs not been transferred. This is in direct contravention of section 46(f) and the IRS's letter ruling and accomplishes indirectly that which could not be achieved directly. The adjustment results in a reduction of Northwestern's cost of service or rate base.

In sum, the Commission's order is in direct conflict with the decisions of the FCC and the federal court. Although we are not dealing with a refusal to allow the transfer of the ITCs in this case, the end result is the same. The Commission's order adjusting Northwestern's income tax

expense had the same effect as if it had ordered Northwestern not to transfer its ITCs, namely, to lower the ratepayers' cost of service.

### III

Northwestern claims the Commission imposed unlawful future filing requirements upon it. The relevant portion of the Commission's order describing its actions provides:

> The Commission agrees with the RUD–AG that evaluation of the Company's rate proposal is hindered when the Company does not provide information regarding the amount of revenue that is produced by the present rates for service for which the Company proposes no change in rates. The Commission finds that evaluation of the Company's rate proposals in future rate cases will be facilitated if the Company identifies the present and proposed test year revenue and number of customers or revenue producing units for all major categories of service.

In other words, because Northwestern proposed to increase the rates for some of its services, while at the same time leaving other rates unchanged, Northwestern provided no information regarding the number of customers served and revenue figures for the rates left unchanged. The Commission argues that in order to determine the revenue responsibilities for different classes of customers, it must evaluate the reasonableness of the allocation of costs to each of the various classes.

The Commission's order is consistent with the requirement of the rule that telephone companies "present exhibits including a detailed income statement and balance sheet for the latest calendar year as shown in regularly filed annual reports", Minn.Rules 7810.6500 (1983), and "include * * * substantiating documents, and exhibits, supporting the [rate] change requested * * *." Minn.Stat. § 237.075, subd. 1 (1982). Information on rates for which no change is requested is necessary to determine the reasonableness of the proposed changes.

The Commission's order was merely an interpretation of Rule 7810.6500.

> If an agency interpretation merely restates existing policy, or is consistent with the regulation it implements, the court has upheld the agency action.

*Cable Communications Board v. Nor-West Cable Communications Partnership*, 356 N.W.2d 658, 667 (Minn.1984); *see* Minn.Stat. § 216A.05, subd. 3(2) (1982) (grants commission authority to obtain information "which it may deem necessary or useful in the proper exercise of its authority"); Minn.Stat. § 237.11 (1982).

### DECISION

The Commission's order voiding the agreement transferring Northwestern's directory operations is reversed. Accordingly, this case is remanded to the Commission to enter findings consistent with this opinion and the Commission is ordered to reinstate the contract between Northwestern and West Direct. The Commission can make a review of the transfer and its future impact on Northwestern's rates on a more complete record in the next rate case. If appropriate, an adjustment can be made at that time.

The Commission's order which adjusts Northwestern's tax liability so as to compensate the ratepayers for the lost ITCs is in direct conflict with the decisions of the FCC and the federal court and, therefore, is also reversed.

The Commission acted within its authority when it ordered Northwestern to include information in its future rate proceeding filings on rates for which no change is proposed.

Affirmed in part, reversed in part and remanded.