In the Matter of the **MINNESOTA PUBLIC UTILITIES COMMISSION'S INITIATION OF SUMMARY INVESTIGATION of the Nature and Extent of Contacts Between Public Utilities and Telephone Companies and Former Minnesota Public Utilities Commissioners.**

In the Matter of the Petition of **NORTHWESTERN BELL TELEPHONE COMPANY, Minneapolis, Minnesota for Authority to Change its Schedule of Telephone Rates for Customers Within the State of Minnesota.**

Nos. C7–87–1296, C9–87–1297.

Court of Appeals of Minnesota.

Dec. 29, 1987.

Review Denied March 18, 1988 and April 4, 1988.

Allan L. Grauer, Richard A. Karre, Omaha, Neb., Stephen T. Refsell, Minneapolis, James A. Gallagher, Maun, Green, Hayes, Simon, Johanneson and Brehl, St. Paul, for relator N.W. Bell Telephone.

Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent MPUC.

Christopher K. Sandberg, Sp. Asst. Atty. Gen., St. Paul, for Minn. Dept. of Public Services.

Gary R. Cunningham, Dennis D. Ahlers, Sp. Asst. Atty. Gen., St. Paul, for Atty. Gen.

Scott Wilensky, Minneapolis, for respondent MPIRG.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LOMMEN,* JJ.

## OPINION

SEDGWICK, Judge.

In separate appeals to this court, relator Northwestern Bell has requested review of two orders by the Public Utilities Commission which vacated and modified a prior 1984 rate order. We consolidated the two appeals. We affirm in part and reverse in part.

## FACTS

This case has a complex and lengthy procedural history. On September 29, 1983, Northwestern Bell filed a petition with the Minnesota Public Utilities Commission ("Commission"), seeking a $109 million annual rate increase. Between January and April 1984, hearings on the petition were conducted by an administrative law judge ("ALJ"). The proceedings concerning this petition are referred to as "Docket 600."

* Acting as judge of the court of appeals by appointment pursuant to Minn. Const. art. 6, § 1.

On May 16, 1984, intervenors Minnesota Public Interest Research Group ("MPIRG"), Evan Henry, and the Department of Public Service ("DPS") petitioned the ALJ for dismissal of Northwestern Bell's pending rate case, because Northwestern Bell had filed a restructuring plan with the Federal Communications Commission in January 1984 which was presented to the Minnesota Commission in April. The Commission ordered the DPS to investigate the financial effect of Northwestern Bell's restructuring on the pending rate action. Northwestern Bell and the DPS subsequently stipulated that the effect of the reorganization should be considered within the context of the rate proceeding, and the DPS withdrew its motion to dismiss.

Before the DPS investigation was completed, however, the ALJ recommended to the Commission that the rate petition be dismissed, because it appeared that the financial effect of Northwestern Bell's reorganization would be substantial. On June 8, 1984, the Commission voted 2 to 1 not to dismiss the rate petition, but to consider the effect of Northwestern Bell's corporate restructuring in the context of the rate proceeding. Commissioners Leo Adams and Roger Hanson voted not to dismiss. Prior to the Commission's vote, Commissioner Hanson wrote and distributed a memorandum recommending denial of the motion to dismiss.

Following the completion of the contested case proceeding, the ALJ recommended that the Commission award Northwestern Bell a $36.1 million rate increase. On July 27, 1984, the Commission granted Northwestern Bell a rate increase of $57,511,000.

In August and September 1984, the Commission heard petitions for rehearing and modification. The DPS recommended reduction of the rate increase by $363,000. The Commission, on its own motion, ordered a rehearing and reopening of the record, and on September 26, 1984, the Commission adopted the DPS recommendation, and modified the rate increase from $57,511,000 to $57,148,000.

Intervenor Henry appealed the Commission's decision, claiming that the Commission's final decision was untimely, because it was not rendered within ten months from the date of Northwestern Bell's petition for a rate increase; that the Commission should have conducted a second contested case hearing before it modified the original order; and that Northwestern Bell had not met its burden of proving the new rates were just and reasonable.

The case was appealed to the Minnesota Supreme Court, which concluded that the Commission had acted within its statutory authority in ordering a rehearing; that the Commission was not required to hold a contested case hearing before it modified its decision; that the summary procedure adopted by the Commission for rehearing did not deprive Henry of due process; and that the decision of the Commission regarding Northwestern Bell's rates was supported by the record and was not arbitrary and capricious. *Henry v. Minnesota Public Utilities Commission*, 392 N.W.2d 209 (Minn.1986).

On April 9, 1986, prior to the supreme court's decision in *Henry*, the Commission ordered an investigation of the proceedings which led to its decision in Docket 600. This investigation, referred to as Docket 177, concerned reports alleging that numerous ex parte contacts had occurred between former Commissioners Adams and Hanson, and a representative of Northwestern Bell, Roy Weir, during the pendency of Docket 600 and other cases. On July 8, 1986, the DPS issued a report which concluded, in part, that during the months Docket 600 was pending before the Commission, Weir had met on numerous occasions with Commissioners Adams and Hanson in restaurants; that Northwestern Bell had paid for those meals; that Weir and the two Commissioners all testified in depositions that those meetings had not involved discussions of Docket 600 issues; that during the time Docket 600 was pending before the Commission there was no statute or rule in Minnesota which prohibited ex parte contacts between Northwestern Bell and the Commission or which prohibited Northwestern Bell from paying for meals consumed by Commissioners; and

that it was unlikely that Commissioners could be bribed with free meals. The DPS report did not recommend reopening or reconsidering Docket 600.

On July 9, the Attorney General petitioned to reopen and consider Docket 600, and on August 14, 1986, MPIRG petitioned to vacate and dismiss Docket 600, based upon the ex parte communications between Weir and the two Commissioners. Subsequently, on October 3, 1986, the Commission issued an order inviting briefs and comment from all of the parties involved. On October 22, 1986, the DPS issued a second report, recommending that the Commission redeliberate its decision in the 1984 rate order.

On November 7, 1986, the Commission began deliberating whether it should take any new action regarding the 1984 rate order. The Commission thereafter voted to approve the Attorney General's petition to reconsider the 1984 rate order.

Between February 12 and 19, 1987, the Commission reconsidered the issues involved in Docket 600, and on April 2, 1987, the Commission issued a final order vacating the 1984 rate order and reopening that order for further deliberation and issuance of a new decision and order. Two days later the Commission issued its new decision, modifying certain terms and reducing Northwestern Bell's rates from $57,148,000 to $45,603,000. This final decision was rendered without conducting a new contested case hearing.

The Commission made the following changes to the 1984 order:

(1) The Commission used a hypothetical capital structure to set Northwestern Bell's rates;

(2) The Commission imputed hypothetical directory revenues to Northwestern Bell as the result of a transfer of Northwestern Bell's directory publication to an independent company;

(3) The Commission continued the requirement that Northwestern Bell reduce its rates due to a tax surplus; and

(4) The Commission required that Northwestern Bell provide Touch–Tone and Speed Call 8 services free to eligible handicapped customers.

In two separate appeals to this court, Northwestern Bell has challenged the Commission's actions. In appeal No. C7–87–1296, Northwestern Bell challenges the Commission's determination that Weir engaged in improper contacts with Commissioners Adams and Hanson, which affected the Commission's original 1984 rate order. Northwestern Bell also claims that the Commission had no authority to reopen the 1984 order; that the supreme court decision in *Henry* bars this action under the doctrine of res judicata; that the Commission's order to reopen violates the 10–month rule of Minn.Stat. § 237.075; and that the Commission's procedures violated Northwestern Bell's constitutional and statutory rights.

In appeal No. C9–87–1297, Northwestern Bell has challenged the changes which the Commission actually made to the 1984 rate order.

## ISSUES

1. Did the Commission have the authority in 1987 to conduct an investigation of its 1984 rate order?

2. Did the Commission's actions violate the 10–month rule of Minn.Stat. § 237.075 (1986)?

3. Did the Commission have the authority to vacate its 1984 rate order based upon "fraud on the tribunal"?

4. Did the Commission deny Northwestern Bell certain procedural rights?

5. Did the Commission err by failing to consider issues raised in Northwestern Bell's motion for reconsideration?

6. Did the Commission err by establishing prospective rates based upon 1983 test year financial data?

7. Did the Commission err by employing a hypothetical capital structure when modifying Northwestern Bell's rates?

8. Did the Commission improperly impute hypothetical directory revenues to Northwestern Bell?

9. Did the Commission erroneously require Northwestern Bell to reduce its customers' rates due to a tax surplus which had already been depleted?

10. Did the Commission err by requiring Northwestern Bell to provide certain services to handicapped customers free of charge?

### ANALYSIS

1. Investigation and Hearing.

■ Northwestern Bell objects to the summary investigation by the DPS and the evidence obtained therefrom, complaining that it was required to respond to discovery requests even though the DPS refused itself to respond to any requests for information. Northwestern Bell also claims that the Commission should have ordered a contested case hearing, since the reasonableness of its rates was at issue.

We find Northwestern Bell's complaints to be without merit. In so doing, we rely upon the following language in *Henry:*

> Minn.Stat. § 237.081, subd. 1 (1984) provides the MPUC may, on its own motion, summarily investigate any matter relating to any service it believes "for any reason" should be examined. If, after making such summary investigation, the MPUC is satisfied there are sufficient grounds to warrant a formal hearing on the matters investigated, it may initiate such a hearing. Minn.Stat. § 237.081, subd. 2 (1984).

*Henry,* 392 N.W.2d at 212 n. 1.

*Henry* also explained that a contested case hearing is required only if the Commission has determined that "significant issues" cannot be resolved to the satisfaction of the Commission. *Id.* at 214. Since the Commission did not order a contested case hearing, it must have concluded that the reasonableness of the rates was not a significant issue which could not be resolved to the satisfaction of the Commission.

We also note that although Northwestern Bell objected to the summary investigation, at the time it did not specifically request a contested case hearing, but instead argued that there was no need for the Commission to take any action whatsoever regarding the 1984 order.

2. Ten–Month Rule.

■ Northwestern Bell claims the Commission's order reopening the 1984 rate order violated the 10–month rule of Minn. Stat. § 237.075, subd. 2 (1986), which provides in part:

> If the commission does not make a final determination concerning a schedule of rates within ten months after the initial filing date [of the original petition for an increase in rates], the schedule shall be deemed to have been approved by the commission * * *. For the purpose of this section, "final determination" means the initial decision of the commission and not any order which may be entered by the commission in response to a petition for rehearing or other relief.

Under similar circumstances, the supreme court in *Henry* rejected Northwestern Bell's claim that the Commission's reopening of a portion of its 1984 order constituted an improper effort to circumvent the 10–month statutory limitation. The *Henry* court explained:

> The statutory time limit refers only to the period during which rates may be suspended and is not a temporal limit on the MPUC's jurisdiction * * *. The clear purpose of the provision is to protect utilities from the potentially confiscatory effect of regulatory delay. In other cases where we have interpreted similar statutory time limits, we have construed these provisions as directory and not mandatory, stating the time limit * * * "[is] obviously designed merely to secure order, uniformity, system, and dispatch in the public business." * * * Consistent with these cases, we conclude subdivision 2 does not deprive the MPUC of jurisdiction to issue a decision in a rate proceeding if it fails to reach a decision within the 10–month suspension period.

392 N.W.2d at 213–14 (citation omitted). In view of the above language, we reject Northwestern Bell's argument that the 10–

month rule barred the Commission's reopening and modification of the 1984 order.

### 3. Fraud on the Commission.

■ Northwestern Bell points out that the ex parte contacts between Weir and Commissioners Hanson and Adams were not actually prohibited by statute in 1984. In fact, Northwestern Bell argues that certain rules and statutes in existence at the time suggested that such lobbying of the Commission was to be expected.

Minn.Stat. § 216A.02 (1984) defines the Commission's three functions: legislative, administrative, and quasi-judicial. Certainly, in matters of the Commission's legislative and administrative functions, some discussion with representatives of the utilities which it regulates is to be expected. However, in matters concerning the Commission's quasi-judicial function, such contacts cannot be condoned.

The Commission did not address the question whether Northwestern Bell's ex parte contacts with the Commission members were illegal; rather, the Commission looked at whether those ex parte contacts constituted an abuse of process, or a type of fraud upon the Commission.

In Minnesota, a court may vacate a judgment within a specific period of time due to extrinsic or intrinsic fraud. Minn.R.Civ.P. 60.02. Rule 60 also recognizes and distinguishes the type of case where "fraud upon the court" is alleged. In discussing this doctrine, one commentator has stated:

> Fraud upon the court differs from extrinsic or intrinsic fraud. * * * Some federal courts have attempted to define fraud upon the court as conduct which defiles the court itself or in which court officers conduct themselves in a way as to impair judicial machinery and prevent an impartial adjudication. * * * Other courts have defined this type of fraud as an unconscionable plan or scheme to improperly influence the court in its decision. * * *

* * * The concept clearly includes bribery of a judge or the employment of counsel in order to bring an improper influence on the court.

2A D. Herr & R. Haydock, *Minnesota Practice* § 60.24 (1985) (citations omitted).

In *Halloran v. Blue and White Liberty Cab Co.*, 253 Minn. 436, 92 N.W.2d 794 (1958), the Minnesota Supreme Court stated:

> A judgment may be set aside at any time for after discovered fraud upon the court. Where a court is misled as to material circumstances, or its process is abused, resulting in the rendition of a judgment which would not have been given if the whole conduct of the case had been fair, the court has inherent power to vacate for fraud and that power includes as well the power to modify.

*Id.* at 442, 92 N.W.2d at 798.

In *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed.2d 1250 (1944), the Supreme Court recognized the abhorrence with which "fraud on the court" is viewed. The *Hazel–Atlas* court stated:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

*Id.* at 246, 64 S.Ct. at 1001.[1]

We recognize that Rule 60.02 and the *Halloran* decision govern fraud on the "court," and do not address the question whether a similar doctrine should be held to exist within the administrative process. Northwestern Bell argues that the Commission has no similar authority to reopen orders based on "fraud on the Commission," since the legislature has not expressly given the Commission such authority.

---

**1.** Northwestern Bell takes the position that the Commission erroneously based its decision to reopen the 1984 rate order on its unsupported belief that the public distrusted the process.

Whether or not the public actually distrusted the process, the *Hazel–Atlas* decision recognizes that the process is designed for the benefit of the public, and should not be abused.

In *WKAT, Inc. v. Federal Communications Commission,* 296 F.2d 375 (D.C.Cir. 1961), the Federal Communications Commission had awarded an application for a permit to construct a television station. While an appeal to the court was pending, information came to light which indicated that WKAT had improperly sought to influence the results of the application. The court remanded the case for an evidentiary hearing on the misconduct, and the Commission appointed a master, conducted hearings, and issued an order disqualifying the applicants. The court subsequently held the order proposed by the Commission to be within its authority.

While the Commission in *WKAT* was proceeding according to the directives of the court, the *WKAT* opinion suggests that administrative agencies should have the same inherent power to reopen their judgments that is accorded the courts under the doctrine of fraud on the court:

> This doctrine applies to the adjudicatory functions of an administrative agency. This is not a mere technicality. Surreptitious efforts to influence an official charged with the duty of deciding contested issues upon an open record in a court with basic principles of our jurisprudence, eat the very heart of our system of government—due process, fair play, open proceedings, unbiased, uninfluenced decision. He who engages in such efforts in a contest before an administrative agency is fortunate if he loses no more than the matter involved in that proceeding.

*Id.* at 383.

In Minnesota, two recent appellate decisions have discussed the question whether an agency has powers which have not been specifically delegated by statute. In *Senior Citizens Coalition v. Minnesota Public Utilities Commission,* 355 N.W.2d 295 (Minn.1984), the supreme court stated:

> The PUC is a state agency of statutory origin. * * * As such, it has only that jurisdiction conferred to it by the legislature. * * * "A lack of statutory authority betokens a lack of jurisdiction."

*Id.* at 302 (quoting *State ex rel. Spurck v. Civil Service Board,* 226 Minn. 253, 259, 32 N.W.2d 583, 586 (1948)).

In *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 369 N.W. 2d 530 (Minn.1985), the court again indicated that a lack of express statutory authority required reversal of a Commission decision. There, again, the court held that the Commission does not have implied authority:

> Neither agencies nor courts may under the guise of statutory interpretation enlarge the agency's powers beyond that which was contemplated by the legislative body.

*Id.* at 534 (quoting *Waller v. Powers Department Store,* 343 N.W.2d 655, 657 (Minn.1984)).

We find the *Senior Citizens* and *Peoples* cases distinguishable, since in those cases the Commission had attempted to exercise an implied authority to award costs or refund revenues, whereas here, the Commission was simply attempting to correct a previous order. We also rely upon a line of Minnesota cases which suggests that the Commission had the implied authority to reopen its 1984 decision.

In 1958, the Minnesota Supreme Court recognized that administrative agencies have powers similar to those exercised by the courts under Rule 60. In *Anchor Casualty Co. v. Bongards Co-operative Creamery Association,* 253 Minn. 101, 91 N.W.2d 122 (1958), the court stated:

> While it is true that the statute in question, § 27.06, does not specifically grant to the commissioner the power to open and rehear matters, neither does it deny that power to him. * * *
>
> * * * It is generally recognized that one of the powers proper to an efficient and just administration of the right to adjudicate is the power to reverse an adjudication which appears to be erroneous. (Federal Rules of Civil Procedure, Rule 60[b].) This power lasts until jurisdiction is lost by appeal or certiorari or until a reasonable time has run * * *.

*Id.* at 105–06, 91 N.W.2d at 125–26. Citing *Handlon v. Town of Belleville,* 4 N.J. 99,

106, 71 A.2d 624, 627 (1950), the court stated:

> Barring statutory regulation, the power may be invoked by administrative agencies to serve the ends of essential justice and the policy of the law. But there must be reasonable diligence. The denial to such tribunals of the authority to correct error and injustice and to revise its judgments for good and sufficient cause would run counter to the public interest. The function cannot be denied except by legislative fiat; and there is none such here. The power of correction and revision, the better to serve the statutory policy, is of the very nature of such governmental agencies.

*Id.* at 106, 91 N.W.2d at 126. In *State ex rel Turnbladh v. District Court,* 259 Minn. 228, 107 N.W.2d 307 (1960), also, the court stated:

> [A]n administrative agency has a well-established right to reopen, rehear, and redetermine the matter even after a determination has been made. This is a rule of general application.

*Id.* at 236, 107 N.W.2d at 312. The *Turnbladh* and *Anchor Casualty* cases have been recently cited with approval. *See, e.g., Stearns–Hotzfield v. Farmers Insurance Exchange,* 360 N.W.2d 384, 389 (Minn.Ct.App.1985).

This line of cases recognizes that an administrative agency has the inherent power to correct its prior decisions. In the past, these decisions have been limited to the "normal" Rule 60 situation, where the power of the tribunal is limited by time constraints. However, since administrative agencies have been accorded a Rule 60 type of authority to reopen and consider decisions based upon allegations of extrinsic or intrinsic fraud, we believe the Commission must also possess the implied authority to reopen judgments at anytime based on the "fraud on the court" doctrine recognized by Rule 60.02.

The Commission determined that the number and timing of the ex parte contacts between Northwestern Bell and Commissioners Hanson and Adams sustained the inference that Northwestern Bell's actions were intended to influence the Commission's decision in Docket 600. The record supports the Commission's determination. During the time the Commission was deliberating on Northwestern Bell's petition for a rate increase, numerous meetings were held between Weir and Commissioner Adams and Hanson. Those meetings were all paid for by Northwestern Bell. The dates upon which Weir paid for meals for Commissioners Hanson and Adams occurred during the time Docket 600 was pending before the Commission. The evidence is more than sufficient to sustain the Commission's inference that Northwestern Bell's actions were intended to influence the commission, and therefore constituted a fraud on the commission. *See Gibson v. Civil Service Board,* 285 Minn. 123, 171 N.W.2d 712 (1969) (an agency's reasonable inferences from the facts should be sustained if there is substantial evidence in the record tending to support those inferences).

Nevertheless, Northwestern Bell argues that there has been no proof that the improper ex parte contacts actually affected the Commission's final rate decision.[2] We disagree.

2. In *PATCO v. Federal Labor Relations Authority,* 685 F.2d 547, 564 (D.C.Cir.1982), the court noted that improper ex parte communications do not render agency proceedings automatically void, but voidable. The *PATCO* court set forth the following standards for determining whether an agency's decision should be vacated:

> [A] court must consider whether, as a result of improper ex parte communications, the agency's decision making process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect. In making this determination, a number of considerations may be relevant: the gravity of the ex parte communications; *whether the contacts may have influenced the agency's ultimate decision; whether the party making the improper contact benefited from the agency's ultimate decision;* whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose.

*Id.* at 564–65 (footnotes omitted (emphasis added)).

As the supreme court recently stated in a similar situation:

> While the record contains no direct evidence that Adams unduly influenced the decision, his mere presence creates the obvious appearance of impropriety and undermines the public confidence in the system. We are incredulous that these sophisticated governmental and utility officials could have assumed otherwise. We therefore hold that there is substantial evidentiary support for the findings of the Commission that the individuals had a duty to disclose their association, that Adams had a substantial conflict of interest and that the proceedings were tainted as a result.

*In re Northern States Power Co.*, 414 N.W.2d 383, 386–87 (Minn.1987).

Here, after hearing the testimony of the parties, the ALJ, who was uninfluenced by the ex parte communications, recommended the adoption of a $36.1 million rate increase. The Commission, however, voted to grant Northwestern Bell a rate increase in the amount of $57,511,000. This discrepancy provides further support for the Commission's subsequent determination that the proceedings in Docket 600 were tainted by the ex parte contacts.

### 4. Denial of Oral Argument.

█ The Commission based its 1987 order upon the record compiled during the 1984 contested case proceedings. In modifying the 1984 decision in April 1987, the Commission did not afford Northwestern Bell an opportunity to present oral argument on the merits. The Commission also issued its order denying reconsideration of the April 1987 decision without allowing Northwestern Bell an opportunity to present oral argument. Northwestern Bell claims the denial of oral argument before the new Commissioners in 1987 constituted a deprivation of its constitutional and statutory rights.

Minn.Stat. § 14.61 (1986), cited by Northwestern Bell, is entitled "Agency Decision in Contested Case," and provides:

> In all contested cases the decision of the officials of the agency who are to render

the final decision shall not be made until * * * an opportunity has been afforded to each party adversely affected to file exceptions and present argument to a majority of the officials who are to render the decision.

This statute clearly refers to a final decision after a contested case hearing, and therefore would have required oral argument in 1984. Northwestern Bell does not claim it was denied oral argument in 1984.

In 1987, when the Commission reopened the 1984 order and issued a new decision on the merits, there was no statute requiring that the parties be allowed to present a second oral argument. Indeed, there was no statute which provided for the procedures used by the Commission in reopening and reconsidering the 1984 order; thus, we believe basic notions of fairness in the decision-making process should control.

The equities weigh against oral argument in the present situation. Northwestern Bell argues that basic concepts of fair play require the allowance of a new opportunity to present oral argument; however, because the ex parte contacts between Northwestern Bell and the Commission in fact constituted fraud on the Commission, Northwestern Bell, itself, cannot be deemed to have engaged in fair play from the beginning. The maxim "He who seeks equity must do equity" is applicable here.

### 5. Order on Reconsideration.

█ Northwestern Bell claims that, upon reconsideration of its April 1987 order, the Commission failed to address several issues. In its order denying reconsideration, the Commission stated:

> The Commission finds that the parties have raised no new arguments or evidence in Petitions for Reconsideration that have not already been thoroughly considered by the Commission.

Northwestern Bell claims that several new arguments were raised in its petition for reconsideration, and the Commission therefore erred by determining that these new arguments had been previously considered. We find this claim to be without merit.

### 6. 1984 Financial Data.

■ Northwestern Bell also argues that the Commission improperly used 1983 test year data in making its 1987 modifications to the 1984 rate order. This argument fails to take into consideration the fact that the 1987 order was simply a modification of the prior 1984 order, and not a consideration of a new request by Northwestern Bell for prospective rate increases. The Commission clearly had no authority to use 1987 data, since a new contested proceeding had not been conducted. Use of the 1983 test year data was therefore proper.

### 7. Hypothetical Capital Structure.

■ Northwestern Bell argues that the Commission had no authority to reevaluate its capital structure, since in *Henry*, the Minnesota Supreme Court had already affirmed the reasonableness of the capital structure established in the 1984 rate order.

While *Henry* determined that the rates set by the Commission in its 1984 order were reasonable, where fraud on the court is alleged, the principal of res judicata may not be invoked. *See Halloran*, 253 Minn. at 442, 92 N.W.2d at 798.

■ Northwestern Bell also argues that the Commission erroneously imposed upon it the burden of proving its capital structure reasonable. Our supreme court recently rejected this argument in *In re Northern States Power Co.*, 416 N.W.2d 719 (Minn. Dec. 11, 1987):

> [E]nactment of Minn.Stat. § 216B.16, subd. 4 (1986) * * * placed on the petitioning utility the burden of proving the proposed rate is fair and reasonable, and, as a component of the rate base, that the capital structure debt-equity allocation is fair and just. When, in the Commission's judgment, a petitioning utility has failed to establish the reasonableness of costs which it claims justifies a proposed rate increase, the Commission itself may compute a hypothetical capital structure that will afford an ultimate determination of a reasonable and just rate.

*Id.*, at 726 (citation omitted). The Commission therefore correctly assigned to Northwestern Bell the burden of proving its capital structure reasonable.

■ The *Northern States Power* court also explained the scope of this court's review when the Commission has adopted a hypothetical capital structure:

> [Whether] the Commissioner has adequately articulated its reasoning employed to reach its conclusion that [a utility] had failed to establish the proposed rate as being "just and reasonable", and [whether] the Commission's conclusion itself was reasonable.

*Id.*, at 727.

Here, the Commission articulated the following reason for its determination in 1987 that Northwestern Bell's proposed equity ratio was not just and reasonable:

> NWB ultimately proposed a capital structure containing a 56.4% equity ratio. This equity ratio is considerably higher than the 50.1% equity ratio proposed by NWB witness Bauhard and authorized by the Commission in [another rate case], only five months prior to the filing of the instant case.

\*     \*     \*     \*     \*     \*

> NWB argues that, as a result of divestiture, the prior capital structure is no longer appropriate. However, NWB has introduced no evidence to demonstrate a shift in total risk or to quantify that total risk. Its main assertion is that an authorized equity ratio containing only 50.1% equity would cause a reduction in its bond rating. The Commission finds this argument unconvincing. No reduction in the Company's bond rating was experienced when, as a consequence of the Company's last general rate proceeding, it was authorized a common equity component of 50.1% for regulatory purposes.

The record supports the Commission's rejection of Northwestern Bell's proposed equity ratio.

There is substantial evidence in the record supporting the Commission's adoption of a 50.1 percent hypothetical equity ratio. First, the capital structure used by the Commission in Northwestern Bell's prior 1982 rate case included a 50.1% equity

ratio. Further, DPS witness Dr. Luther Thompson recommended a capital structure of 50% equity, 43.6% debt and 6.4% imputed debt. This recommendation was based on the average equity ratios of four telephone companies analyzed by one witness, five telephone companies analyzed by a witness for the Attorney General, 25 electric companies analyzed by a witness for Northwestern Bell, and four telephone companies and four electric companies analyzed by another witness. Dr. Thompson had selected these groups because their average bond ratings and average betas [3] were similar to those of Northwestern Bell. The 50.1% equity component adopted by the Commission approximates the mean equity ratio calculated by Dr. Thompson for the five comparable groups. We therefore conclude the Commission's adoption of a 50.1 percent hypothetical equity ratio was reasonable.

8. Directory Revenues.

In December 1983, shortly before the hearings began on Northwestern Bell's 1983 petition for a rate increase, Northwestern Bell decided to transfer its directory publication operations to U.S. West Direct. In making this transition, Northwestern Bell transferred certain assets to Landmark Publishing, U.S. West Direct's parent company, and entered into a series of contracts with U.S. West Direct. When the Commission learned of the transfer, it directed the ALJ to consider this transfer in making its recommendations regarding Northwestern Bell's rates.

In Northwestern Bell's initial direct testimony, filed September 1983 with its petition for a rate increase, Northwestern Bell did not adjust its test year financial data to reflect the directory transfer; rather, Northwestern Bell included income, expenses, and investments from directory operations, as in the past, in the calculation of its 1983 test year revenue requirements. Northwestern Bell urged that no modification to its test year financials was justified, since its approach would insulate ratepayers from any possible detrimental effects of the transfer.

Upon learning of the transfer, the Commission requested the parties to discuss in the evidentiary hearings and any future filings the question whether the sale of the directory operations to U.S. West Direct, and the consequent replacement of Northwestern Bell's directory income with fees paid by U.S. West Direct, would have an effect on Northwestern Bell's ratepayers.

The intervenors proposed that the Commission either void Northwestern Bell's transfer of its directory operations and require Northwestern Bell to resume publication, or make an upward adjustment in Northwestern Bell's operating income to account for the growth which would have occurred if Northwestern Bell had continued to publish its directories. The DPS proposed that the Commission take the average of the past three years' growth levels in Northwestern Bell's net directory income, and add that amount to Northwestern Bell's test year operating income.

The ALJ recommended that the Commission adopt the DPS's imputed growth levels, and impute $2,526,666 in directory revenues to Northwestern Bell.

In its 1984 order, the Commission adopted the intervenors' first proposal, voided the transfer, and directed the return of directory operations to Northwestern Bell. On appeal, this court reversed, concluding that the Commission lacked such authority. *See In re Northwestern Bell Telephone Co.*, 367 N.W.2d 655 (Minn.Ct. App.1985).

In its 1987 order after reconsideration, the Commission adopted the intervenors' alternative proposal and the ALJ's recommendation that $2,526,666 be imputed to Northwestern Bell to account for expected revenues from its directory publication.

On appeal, Northwestern Bell argues that the Commission should not have adopted this imputed income, by reason of

---

3. A beta is a measure of the volatility of the rate of return of a stock, relative to the stock market as a whole. Relatively less movement of a stock in the market renders that stock less risky, and vice-versa.

the following language in this court's opinion in *Northwestern Bell:*

> [T]he Commission is ordered to reinstate the contract between Northwestern and West Direct. The Commission can make a review of the transfer and its future impact on Northwestern's rates on a more complete record *in the next rate case.* If appropriate, an adjustment can be made at that time.

*Id.* at 663 (emphasis added). Northwestern Bell argues that this language precludes the Commission from imputing directory income in the present case, which is not the equivalent of a "next rate case."

We note, however, the following language in *Northwestern Bell:*

> The Commission can investigate the reasonableness of the publishing fees paid by West Direct to Northwestern pursuant to its inherent power to include the expenses, revenues and investments related to directory advertising in telephone ratemaking proceedings. The Commission's authority is limited to either accepting or rejecting the ALJ's recommendation of imputing income to Northwestern.

*Id.* at 661.

The Commission was free to review the record and revise it in a reasonable manner. Since this court held that the Commission had no authority to void the directory transfer, the only option for the Commission when it vacated the 1984 order was either to accept or reject the ALJ's recommendation of imputing income to Northwestern Bell.

The Commission in its 1987 order accepted the findings of the ALJ that Northwestern Bell's revenues should be increased by $2,527,000 as a result of imputed income from the directory revenues, reasoning that "[t]he benefits appear to lay heavily on the side of U.S. West's shareholders without a corresponding benefit falling to Minnesota ratepayers." The Commission also adopted the ALJ's reasoning that Northwestern Bell failed to provide the Commission with appropriate data regarding the potential revenue impact of the

directory transfer and that substantial evidence supported imputation of income.

The record supports the Commission's imputation of $2,526,666 in income. That number was obtained by using figures provided by Northwestern Bell, even though Northwestern Bell challenged the accuracy of its figures. The ALJ noted that deficiencies in the record caused by a lack of information provided by Northwestern Bell should not require imputation of a lesser amount. Northwestern Bell had the burden of proving its rate increase was reasonable. *See* Minn.Stat. § 237.075, subd. 4. We believe the ALJ did the best he could, based upon the data which Northwestern Bell did provide. The Commission's acceptance of the ALJ's findings and recommendations was not arbitrary and capricious, and those findings and recommendations are supported by the record.

9. Tax Surplus.

In 1983, in a prior rate decision, the Commission adjusted Northwestern Bell's test year figures to amortize, over a three year period, a deferred tax reserve surplus that had resulted from a reduction in federal tax rates.

In its 1984 rate order, the Commission continued to amortize the excess deferred taxes over the three year period.

> The Commission concludes that the surplus tax reserve should continue to be amortized over a three year period as ordered in [the previous 1983 decision].

We must assume that by 1987, the entire tax surplus had been returned to the ratepayers in the form of reduced rates.

In its 1987 order, the Commission ordered Northwestern Bell to return prospectively to its ratepayers the difference between the $57,148,000 rate increase allowed in 1984 and the $45,000,000 rate increase authorized by the 1987 modified order. In that order, however, the Commission did not take into account the fact that Northwestern Bell, after 1985, would have been allowed to charge higher rates, because the three year amortization period of the excess tax reserve surplus would have ex-

pired. The Commission erred by failing to take this fact into account.

10. Touch–Tone and Speed Call 8 Services.

██ Northwestern Bell provides two services that were the subject of its 1984 rate design: Touch–Tone and Speed Call 8. The Touch–Tone service enables a telephone user to dial a number by pushing number buttons on the telephone, rather than using a rotary dial. The Speed Call 8 service enables a user to dial preprogrammed two-digit codes, rather than dialing a complete telephone number.

In its 1984 rate order, the Commission set Speed Call 8 and Touch–Tone rates for handicapped persons at $1, in order to facilitate use of the telephone system by those persons. In its 1987 modification of the 1984 order, the Commission ordered Northwestern Bell to provide the Touch–Tone and Speed Call 8 services to handicapped persons without charge.

By requiring handicapped customers to pay for basic local service, but giving them the Touch Tone and Speed Call 8 services free, the Commission attempted to equalize the value of service available to the handicapped customer with that available to non-handicapped customers. In other words, because certain disabilities make the use of a regular telephone difficult, many handicapped customers derive less value from standard telephone service than do other customers.

The Commission's decision regarding this issue involves rate design, which requires the Commission to exercise its legislative decision-making authority. Such authority involves policy decisions, and this court's review is limited to upholding the Commission's action unless it has resulted in unjust, unreasonable or discriminatory rates, or has produced an arbitrary result. *See Hibbing Taconite Co. v. Minnesota Public Utilities Commission*, 302 N.W.2d 5, 9 (Minn.1980).

While we applaud the reasoning behind the Commission's exercise of its authority in this instance, nevertheless there is no evidence in the record supporting the Commission's decision. While Northwestern Bell has the burden of proving by clear and convincing evidence that the Commission's determination was erroneous, it was unable to meet this burden because, at the time the Commission's decision was rendered in 1984, Northwestern Bell was not aware that the Commission was considering the provision of free services to the handicapped; thus, no evidence was introduced on this issue.

Regulatory statutes obligate the Commission to set "just and reasonable" rates. *See* Minn.Stat. § 237.075, subd. 6. By requiring Northwestern Bell to give away services free of charge without considering the actual effect upon Northwestern Bell's rate of return, the Commission has violated its responsibility to ensure that Northwestern Bell may charge reasonable rates.

Respondents point to evidence that the markup for the Touch–Tone services is 1,567%, and argue that other ratepayers will make up the revenue lost by the provision of the free services to handicapped customers. Respondents also note that those persons eligible for the free Touch–Tone and Speed Call 8 services must continue to pay charges for basic local service.

The record indicates only that Northwestern Bell's other, non-handicapped, customers will be paying for all Touch–Tone and Speed Call 8 services. It does not, as respondents argue, demonstrate that other ratepayers will "make up the revenue foregone" by providing free services to handicapped customers. We therefore conclude that this portion of the Commission's order must be reversed.

We have considered Northwestern Bell's other arguments and find them to be without merit.

**DECISION**

Affirmed in part and reversed in part.